MEDICAL STAFFING NETWORK, INC., PLAINTIFF v. THOMAS DEAN RIDGWAY AND
TRINITY HEALTHCARE STAFFING GROUP, DEFENDANTS

No. COA07-1486

(Filed 6 January 2009)

**1. Contracts— novation—merger clause**

The trial court did not err by holding a 2000 Agreement was legally binding on the parties and had not been superseded by a 2001 Agreement because: (1) North Carolina recognizes several methods by which a contract may be discharged, including a novation which is the substitution of a new contract; (2) although merger clauses create a rebuttable presumption that the writing represents the final agreement between the parties, the one exception to this general rule applies when giving effect to the merger clause would frustrate the parties' true intentions; (3) although plaintiff has not presented any evidence of fraud, bad faith, unconscionability, negligent omission or mistake in fact to rebut the presumption of novation created by a merger clause in the 2001 Agreement, the covenants of both agreements are not wholly inconsistent but can be enforced consistently; and (4) the two agreements were executed for two distinct purposes since the 2000 Agreement was executed to govern the employment relationship of all employees whereas the 2001 Agreement was executed as part of a stock purchase agreement offered to only select employees.

**2. Employer and Employee— covenant not to compete—non-solicitation clause—failure to show legitimate business interest**

The trial court erred by failing to conclude that the restrictive covenants in a 2000 Agreement were invalid as a matter of law, and the breach of contract claim is reversed, because: (1) plaintiff presented no evidence and the trial court made no findings that plaintiff had any legitimate business interest in preventing competition with, foreclosing the solicitation of clients and employees of, and protecting the confidential information of an unrestricted and undefined set of plaintiff's affiliated companies that engage in business distinct from the medical staffing business in which defendant individual had been employed; and (2) on its face, the bar extended beyond any legitimate interest plaintiff might have in this case.

**3. Employer and Employee; Wrongful Interference— tortious interference with contract—overbroad**

The trial court erred by finding defendants liable for tortious interference with a contract, and this claim is reversed because the 2000 Agreement was so overbroad as to be unenforceable.

**4. Trade Secrets— misappropriation—access and opportunity to use**

The trial court did not err by finding that defendants misappropriated two categories of trade secrets, including information about per diem nurses and business strategies and marketing plans, because: (1) plaintiff has not rested on bare allegations and speculation, but instead introduced evidence that defendant company, through defendant individual, had access to plaintiff's trade secrets as well as the opportunity to use them; (2) there was evidence of a substantial turnaround in defendant company's business, as well as a concurrent, substantial decrease in plaintiff's business in the same market, during the same time period; and (3) viewing all of these circumstances together, there was sufficient evidence to sustain a finding that defendants knew of plaintiff's confidential information, had an opportunity to acquire it, and did so, causing plaintiff harm.

**5. Unfair Trade Practices— violation of trade secret protection—injury**

The trial court did not err by holding that defendant company had committed unfair and deceptive trade practices in violation of N.C.G.S. § 75-1.1 because: (1) the trial court's findings that defendant violated the Trade Secret Protection Act and caused injury to plaintiff are supported by competent evidence; and (2) these findings supported the court's conclusion that defendant committed unfair and deceptive trade practices.

**6. Trade Secrets— misappropriation—measure of damages**

Plaintiff medical staffing company was entitled to recover as damages for misappropriation of its trade secrets by its competitor and its former employee the greater of the extent to which plaintiff has suffered economic loss or the extent to which the competitor has unjustly benefitted from use of plaintiff's marketing strategy and per diem nurse information, including nurses' home phone numbers, pay rates, specializations, and preferences regarding shifts and facilities.

MEDICAL STAFFING NETWORK, INC. v. RIDGWAY

[194 N.C. App. 649 (2009)]

Appeal by defendants from judgment entered 2 March 2007 by Judge James C. Spencer in Wake County Superior Court. Heard in the Court of Appeals 9 September 2008.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Christopher G. Smith and Heather Adams, for plaintiff appellee.*

*Ellis & Winters, LLP, by Paul K. Sun, Jr., for defendant appellants.*

McCULLOUGH, Judge.

Thomas Dean Ridgway ("Ridgway") and Trinity Healthcare Staffing Group ("Trinity"), (collectively ".defendants"), appeal from a judgment entered 2 March 2007, finding defendants jointly and severally liable to Medical Staffing Network, Inc. ("MSN") for breach of contract, misappropriation of trade secrets, unfair and deceptive trade practices, and tortious interference with a contract. MSN was awarded injunctive relief and damages in the amount of $1,104,495.60, plus prejudgment interest in the amount of $62.09 per day on the compensatory damages.[1]

" 'It is well settled in this jurisdiction that when the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts.' " *Keel v. Private Bus., Inc.*, 163 N.C. App. 703, 707, 594 S.E.2d 796, 799 (2004) (quoting *Shear v. Stevens Building Co.*, 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992)).

The relevant facts and procedural background are as follows: MSN, based in Boca Raton, Florida, and Trinity, based in Florence, South Carolina, are competitors in the market for healthcare staffing. In the Raleigh, North Carolina market, specifically, MSN and Trinity compete for the placement of *per diem* nurses, which are nurses that are available for hire by hospitals or other healthcare providers for specific shifts. MSN's two largest clients in the Raleigh market were WakeMed and Duke, which historically, comprised 85% of MSN's business in the Raleigh market. WakeMed was Trinity's first client and has historically been its largest client.

---

1. The trial court found actual damages in the amount of $283,300.00, which were trebled, pursuant to N.C. Gen. Stat. § 75-16 (2007) for a total amount of $849,900.00 in damages. The court also awarded attorneys' fees and costs in the amount of $254,595.62.

In May of 2000, MSN hired Ridgway as manager of its Raleigh branch. Prior to joining MSN, Ridgway had worked in the staffing industry since 1997 and had worked as the Raleigh branch manager for another staffing company, Scientific Staffing, Inc. Upon commencement of his employment relationship with MSN, Ridgway signed an "Agreement Regarding Confidential Information, Non-Competition, and Non-solicitation" ("the 2000 Agreement"). The 2000 Agreement is between MSN and "any parent, division, subsidiary, affiliate, predecessor, successor or assignee hereof[.]" The 2000 Agreement includes restrictive covenants, addressing nondisclosure of MSN's confidential information, non-solicitation of MSN employees and clients, and non-competition with MSN Business.

With Ridgway on its team, MSN's Raleigh Branch became one of MSN's most successful branches. In 2004, the Raleigh Branch set records for revenue and net income, and Ridgway was named MSN's Branch Manager of the Year.

Sometime prior to 23 June 2005, Trinity hired Keith Metts, a former MSN employee, knowing he had a non-competition agreement with MSN. Metts began soliciting Ridgway to join Trinity. MSN introduced evidence at trial that shortly before 23 June 2005, Ridgway accessed a number of confidential documents on MSN's computer network, including MSN's Market Action plan. Ridgway was authorized to access these documents, but in the past, he had done so only occasionally.

On 23 June 2005, Ridgway met with Trinity's president and others at the Angus Barn restaurant in Raleigh to discuss his interest in joining Trinity. Trinity was aware that Ridgway had a non-competition agreement with MSN, but did not ask to see the agreement and did not know its terms.

On 1 July 2005, Ridgway gave MSN two weeks' notice of his intent to resign. MSN informed Ridgway that he did not need to work his two-week notice period and instructed him to leave on 5 July 2005.

Several of MSN's employees testified that, after Ridgway's resignation, Ridgway attempted to recruit them to join Trinity. From August 2005 through the time of trial, ten nurses resigned from MSN and began working for Trinity. Ridgway also attempted to solicit MSN's clients, including WakeMed. Ridgway's relationship with WakeMed predated his employment with MSN.

**MEDICAL STAFFING NETWORK, INC. v. RIDGWAY**

[194 N.C. App. 649 (2009)]

In the year following Ridgway's departure, MSN's revenue declined, and Trinity's revenue increased significantly. WakeMed, however, is the only client that MSN claims it lost to Trinity.

## I. Novation

[1] First on appeal, defendants contend that the trial court erred by holding that the 2000 Agreement was legally binding on the parties. Defendants argue that the 2000 Agreement was superseded by a Confidentiality and Noncompetition Agreement, which was executed in 2001 as part of a 2001 Incentive Stock Option Agreement ("2001 Agreement"). The 2001 Agreement is between MSN's corporate parent, MSN Holdings, Inc. ("MSN Holdings"), and Ridgway, and includes restrictive covenants concerning nondisclosure of confidential information, non-solicitation of employees and clients, and non-competitions. We disagree.

North Carolina recognizes several methods by which a contract may be discharged, including a novation, which is the substitution of a new contract. *Equipment Co. v. Anders*, 265 N.C. 393, 400, 144 S.E.2d 252, 257 (1965). It is well established that

> " '[t]he essential requisites of a novation are [1] a previous valid obligation, [2] the agreement of all the parties to the new contract, [3] the extinguishment of the old contract, and [4] the validity of the new contract' . . . . 'Ordinarily . . . in order to constitute a novation, the transaction must have been so intended by the parties.' "

*Bowles v. BCJ Trucking Servs., Inc.*, 172 N.C. App. 149, 153, 615 S.E.2d 724, 727, *disc. review denied*, 360 N.C. 60, 623 S.E.2d 579 (2005) (citations omitted).

> If the parties do not say whether a new contract is being made, the courts will look to the words of the contracts, and the surrounding circumstances, if the words do not make it clear, to determine whether the second contract supersedes the first. If the second contract deals with the subject matter of the first so comprehensively as to be complete within itself or if the two contracts are so inconsistent that the two cannot stand together a novation occurs.

*Whittaker General Medical Corp. v. Daniel*, 324 N.C. 523, 526, 379 S.E.2d 824, 827, *reh'g denied*, 325 N.C. 277, 384 S.E.2d 531 (1989).

Additionally, the presence of a merger clause in a second contract may cause a novation in a second contract. "Merger clauses create a rebuttable presumption that the writing represents the final agreement between the parties. Generally, in order to effectively rebut the presumption, the claimant must establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987), *disc. review denied*, 321 N.C. 747, 366 S.E.2d 871 (1988).

The one exception to this general rule applies when giving effect to the merger clause would frustrate the parties' true intentions. *Id.* Under this exception, the court can look to "the parties' overall intended purposes of the transaction in each case and whether admission of parol evidence will contradict or support those intentions as expressed in the writing(s)." *Id.* at 333, 361 S.E.2d at 319.

In the case at bar, while the 2001 Agreement does not include express language indicating that it was intended to supersede the 2000 Agreement, it does contain the following merger clause:

5. Entire Agreement. This Agreement reflects the entire agreement between the parties with regard to its subject matter and may not be modified or amended except in a writing signed by both parties.

Because MSN has not presented any evidence of fraud, bad faith, unconscionability, negligent omission or mistake in fact to rebut the presumption of novation created by the above merger clause, the determinative issue is whether the trial court properly concluded that giving effect to the 2001 merger clause would frustrate the parties' true intentions.

Here, the trial court concluded that the "2001 Agreement goes beyond the 2000 Agreement and places additional—but not inconsistent—restrictions upon Mr. Ridgeway." We agree that the covenants of the 2000 Agreement and 2001 Agreement are not wholly inconsistent, but rather, can be enforced consistently.

Likewise, the trial court found that the 2000 Agreement and 2001 Agreement were executed for different purposes. We agree that the contexts in which the two agreements were executed are distinguishable. The evidence shows that the 2000 Agreement was executed to govern the employment relationship between Ridgway, as an employee, and MSN, as his employer. This type of agreement was

signed by all MSN employees upon commencement of the employment relationship; whereas, the 2001 Agreement was executed as part of a stock purchase agreement, between MSN Holdings, as a seller of stock, and Ridgway, as the purchaser of that stock. Only select employees were invited to participate in Holding's stock plan.

The trial court's findings that the agreements were executed for two distinct purposes and can be enforced consistently supports the trial court's conclusion that the two agreements were not intended to be substitutes, but rather, were to be construed together, the merger clause notwithstanding. *See Generally Davis v. National Medical Enterprises, Inc.*, 253 F.3d 1314, 1320 (11th Cir. 2001) (Distinguishing employment agreements and stock purchase agreements based upon the divergent purposes and the parties involved in each). Accordingly, the trial court did not err in concluding that the 2000 Agreement had not been superseded by the 2001 Agreement.

## II. Restrictive Covenants

[2] Next, defendants contend that the restrictive covenants in the 2000 Agreement are invalid as a matter of law. We agree.

"When considering the enforceability of a covenant not to compete, a court examines the reasonableness of its time and geographic restrictions, balancing the substantial right of the employee to work with that of the employer to protect its legitimate business interests." *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 86, 638 S.E.2d 617, 618 (2007). The reasonableness of a non-competition covenant is a matter of law for the court to decide. *Shute v. Heath*, 131 N.C. 281, 282, 42 S.E. 704, 704 (1902). Such agreements are disfavored by the law. *Howard v. Oakwood Homes Corp.*, 134 N.C. App. 116, 121-22, 516 S.E.2d 879, 883, *disc. review denied*, 350 N.C. 832, 539 S.E.2d 288 (1999), *cert. denied*, 528 U.S. 1155, 145 L. Ed. 2d 1072 (2000).

To be enforceable under North Carolina law, a non-competition agreement must be: (1) in writing; (2) part of an employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest. *See Farr Assocs. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000). The party who seeks enforcement of the covenant has the burden of proving the reasonableness of the agreement. *Hartman v. Odell and Assoc., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994), *disc. review denied*, 339 N.C. 612, 454 S.E.2d 251 (1995).

To be valid, the restrictions "must be no wider in scope than is necessary to protect the business of the employer." *Manpower v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979). In North Carolina, "[t]he protection of customer relations against misappropriation by a departing employee is well recognized as a legitimate interest of an employer." *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (1988), *disc. review granted in part*, 330 N.C. 123, 409 S.E.2d 610 (1991), *aff'd*, 335 N.C. 183, 437 S.E.2d 374 (1993). Additionally, a covenant is reasonably necessary for the protection of a legitimate business interest " 'if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers[.]' " *A.E.P. Industries v. McClure*, 308 N.C. 393, 408, 302 S.E.2d 754, 763 (1983) (citations omitted)).

This Court has held that restrictions barring an employee from working in an identical position for a direct competitor are valid and enforceable. *See Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 638-39, 568 S.E.2d 267, 273 (2002) (finding a one-year, two-state restriction against employment with a direct competitor to be reasonable and within a legitimate business interest). However, we have held that restrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee. *See, e.g., Paper Co. v. McAllister*, 253 N.C. 529, 534-35, 117 S.E.2d 431, 434 (1960) (finding a non-compete covenant overbroad and unenforceable where the employee's employment duties were confined exclusively to the *sale and distribution* of *fine* paper products, yet the restrictive covenant contained in his employment agreement sought to prevent him from engaging in the manufacture or distribution of *all* paper or paper products); *see also VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508-09, 606 S.E.2d 359, 362-63 (2004) (finding a two-year restriction against employment with "similar businesses" throughout the Southeast to be unreasonable). Likewise, we have held that one franchisee has no legitimate interest in preventing an employee from competing with franchisees in other cities or states. *Manpower*, 42 N.C. App. at 522-23, 257 S.E.2d at 115.

Here, defendants contend that the restrictive covenants are facially overbroad and unenforceable because they are not limited to the protection of the interests of Medical Staffing Network,

Inc., Ridgway's employer, but, rather, the 2000 Agreement defines "MSN" to include "any parent, division, subsidiary, affiliate, predecessor, successor, or assignee." As drafted, the covenant not to compete would prevent Ridgway from working in any business within a 60-mile radius of Raleigh that competes with MSN's parent, or any of its divisions, subsidiaries, affiliates, predecessors, or assignees, even if Ridgway's employment duties for MSN had nothing to do with that business.

Likewise, as drafted, the non-solicitation clause contained in Section 9(b) of the 2000 Agreement prevents Ridgway not only from engaging in business with current or former clients of MSN with whom he developed a relationship, but also prohibits him from soliciting the business of any "MSN client," which as defined by the agreement, includes clients of any of MSN's affiliates or divisions outside of the medical staffing business with whom Ridgway would not have had contact. *See Electrical South, Inc. v. Lewis*, 96 N.C. App. 160, 167, 385 S.E.2d 352, 356 (1989), *disc. review denied*, 326 N.C. 504, 393 S.E.2d 876 (1990) (interpreting the word "or" in its conjunctive sense so as to construe the restriction against the drafter).

MSN presented no evidence, and the trial court made no findings that MSN had any legitimate business interest in preventing competition with, foreclosing the solicitation of clients and employees of, and protecting the confidential information of an unrestricted and undefined set of MSN's affiliated companies that engage in business distinct from the medical staffing business in which Ridgway had been employed. We conclude that on its face, this bar extends beyond any legitimate interest MSN might have in this case.[2] As such, the restrictive covenants in the 2000 Agreement are unenforceable, and we reverse with respect to MSN's breach of contract claim. *Accord Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 682-85, (S.D. Ind. 1997); *Brenneman v. NVR, Inc.*, 2007 U.S. Dist. LEXIS 12761 (S.D. Ohio 2007); *Industrial Techs. v. Paumi*, 1997 Conn. Super. LEXIS 1499 (Conn. Super. Ct. 1997).

---

2. There is also evidence that the restrictive covenants at issue are overbroad as applied to the facts of this case. For instance, one of MSN Holding's divisions, General Staffing Network ("GSN"), engages in clerical, administrative, and industrial staffing. GSN does not engage in medical staffing and is managed separately from MSN. As applied, the 2000 Agreement would foreclose Ridgway's opportunity to work in or solicit, every company in any of these industries, within 60 miles of Raleigh, despite the fact that the nature of Ridgway's employment with MSN was not such as to have brought him in personal contact with GSN's customers or to have enabled him to acquire valuable information as to the nature and character of GSN's business or the names and requirements of GSN's customers.

### III. Interference with Contract

**[3]** By their third assignment of error, defendants argue that the trial court erred in finding defendants liable for tortious interference with a contract because the 2000 Agreement was not a valid contract. We agree. As previously discussed, the 2000 Agreement is so overbroad as to be unenforceable. Accordingly, we reverse with respect to MSN's tortious interference with a contract claim.

### IV. Misappropriation of Trade Secrets

**[4]** By their fourth assignment of error, defendants challenge the trial court's finding that defendants misappropriated two categories of trade secrets, information about *per diem* nurses and business strategies and marketing plans. Defendants contend that (1) there was insufficient evidence to support the trial court's findings that Ridgway copied or transmitted any information from MSN's database; and (2) MSN failed to prove it was damaged by any of the alleged misappropriation of trade secrets. We disagree.

In order to establish a *prima facie* case for trade secret misappropriation, MSN must offer substantial evidence that the defendant "(1) knows or should have known of the trade secret, and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed or used it without the express or implied consent of the owner." N.C. Gen. Stat. § 66-155 (2007).

Defendants place great weight on the fact that MSN has no direct evidence that Ridgway copied or transmitted any information from MSN's database, which contained MSN's nurses' phone numbers, pay rates, specializations, and preferences regarding shifts and facilities. Likewise, defendants argue that although there was evidence that Ridgway accessed marketing information and client order documents during his last thirty days at MSN, MSN presented no evidence that Ridgway used information about MSN's business strategies and marketing plans once he joined Trinity. Direct evidence, however, is not necessary to establish a claim for misappropriation of trade secrets; rather, such a claim may be proven through circumstantial evidence. *See Byrd's Lawn & Landscaping, Inc. v. Smith,* 142 N.C. App. 371, 376-77, 542 S.E.2d 689, 693 (2001) (holding that the plaintiff's circumstantial evidence was sufficient to support a trade secret misappropriation cause of action); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC,* 174 N.C. App. 49, 57-58, 620 S.E.2d 222, 229 (2005), *disc. review denied,* 360 N.C. 296, 629 S.E.2d 289 (2006) (holding that cir-

cumstantial evidence of the defendant's access to trade secrets combined with a substantial increase in the defendant's business, and concurrent, substantial decrease in the plaintiff's business in the same locations, during the same time period, was sufficient to establish a *prima facie* case of misappropriation of trade secrets); *see also Static Control Components v. Darkprint Imaging*, 200 F. Supp. 2d 541, 545-46 (2002).

Here, MSN has not rested on bare allegations and speculation. Instead, MSN introduced evidence that Trinity, through Ridgway, had access to MSN's trade secrets as well as the opportunity to use them. There is evidence that shortly before the Angus Barn dinner with Trinity and repeatedly after the dinner, Ridgway accessed MSN's "game plan" and other confidential documents from MSN's network with unusual frequency. MSN also introduced evidence that following Ridgway's resignation, Ridgway began calling nurses in an effort to recruit them to join Trinity. Thus, there is evidence that Ridgway had access to and was using MSN's confidential nurse contact information after he left MSN. In addition to defendants' access to MSN's game plan and marketing information, there is evidence of a substantial turnaround in Trinity's business, as well as a concurrent, substantial decrease in MSN's business in the same market, during the same time period. Viewing all of these circumstances together, there was sufficient evidence to sustain a finding that defendants knew of MSN's confidential information, had an opportunity to acquire it, and did so, causing MSN harm. This assignment of error is overruled.

## V. Unfair and Deceptive Trade Practices

[5] By their fifth assignment of error, defendants contend that the trial court erred in holding that Trinity committed unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 (2007). We disagree.

Under N.C. Gen. Stat. § 75-1.1, a plaintiff must prove "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).

A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1. N.C. Gen. Stat. § 66-146 (2007). Here, as previously discussed, the trial court's findings that Trinity violated the trade secret protection act and caused injury to MSN are supported by competent evidence. These findings

support the court's conclusion that Trinity committed unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1. N.C. Gen. Stat. § 66-146.

## VI.  Damages

[6]  Finally, defendants contend that MSN's proof and the trial court's award were based on an improper measure of damages. We agree.

Since we have concluded that the 2000 Agreement is overbroad and unenforceable as a matter of law, MSN's breach of contract claim and tortious interference with a contract claim fail. The proper measure of damages for MSN's claim for misappropriation of trade secrets is the "economic loss or the unjust enrichment caused by misappropriation of a trade secret, whichever is greater." N.C. Gen. Stat. § 66-154(b) (2007). The damages award, as stated in the trial court's order, does not specify the portion of damages that is attributable to the misappropriation claim. Thus, we vacate the portion of the order awarding damages and remand for a new calculation and award of the greater of either the extent to which MSN has suffered economic loss or the extent to which Trinity has unjustly benefitted from the use of MSN's (1) marketing strategy information and (2) *per diem* nurse information, including nurses' home phone numbers, pay rates, specializations, and preferences regarding shifts and facilities.

We note, however, that the party seeking damages bears the burden of showing that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty. *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585, *reh'g denied*, 320 N.C. 639, 360 S.E.2d 92 (1987). While the reasonable certainty standard does not require absolute certainty, it requires something more than "hypothetical or speculative forecasts." *Southern Bldg. Maintenance v. Osborne*, 127 N.C. App. 327, 332, 409 S.E.2d 892, 896 (1997).

We agree with defendants that the trial court's use of Trinity's total revenue as a basis for calculating MSN's lost profits[3] was too speculative to constitute a proper measure of damages. In addition to the arbitrary "midpoint" used in this calculation, this measure of dam-

---

3. The trial court's order provides that to calculate lost profit, the trial court used the mid-point between Trinity's approximate total revenues and MSN's approximate decreased revenue since Trinity hired Ridgway, and then, multiplied that number by a 12 percent profit margin. The trial court noted that 12 percent was "a conservative profit percentage given that the actual operating profit of the MSN Raleigh Branch during the relevant time period was 12.3 percent."

ages was based on the faulty premise that MSN would have gained all of Trinity's revenue but for defendant's wrongful conduct. *See Olivetti*, 319 N.C. at 548, 356 S.E.2d 587. We conclude that Trinity's revenue could have increased for a number of reasons unrelated to defendants' conduct. For example, if any of Trinity's former clients simply expanded their operations and began placing larger nurse orders, Trinity's revenue would increase, and such increase would not have been proximately caused by defendants' conduct.

We conclude that a more reasonably certain measure of the economic loss or the unjust enrichment proximately caused by Trinity's misappropriation of MSN's nurse information would be the profit that Trinity gained from the ten nurses that Trinity acquired from MSN. Likewise, to measure the economic loss or the unjust enrichment proximately caused by Trinity's misappropriation of MSN's marketing strategy information, the trial court should consider whether MSN's and Trinity's respective market shares have changed since Trinity acquired MSN's marketing information and "game plan"; if so, the court should measure profits attributable to such changes in the respective market shares. In calculating profit with reasonable certainty, the trial court must take into account all relevant factors, which in this case, would include, for instance, the rates paid by MSN's and Trinity's clients as well as the rates paid to the nurse employees during the relevant time period. *See McNamera v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 411-12, 466 S.E.2d 324, 332, *disc. review denied*, 343 N.C. 307, 471 S.E.2d 72 (1996) (vacating and remanding for a new trial on damages where the damages award was not based on all relevant factors).

For the foregoing reasons, we reverse in part and vacate and remand for a new trial on the issue of damages.

Reversed in part and vacated and remanded in part.

Judges McGEE and STROUD concur.

Concurred prior to 31 December 2008.