Safety Test & Equip. Co. v. Am. Safety Util. Corp., 2016 NCBC 98.

STATE OF NORTH CAROLINA

COUNTY OF CLEVELAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 1037

SAFETY TEST & EQUIPMENT
COMPANY, INC.,

        Plaintiff,

        v.

AMERICAN SAFETY UTILITY
CORPORATION; CHARLES R.
PRICE; CHARLES A. PRICE; JOHN
E. HAMRICK; and CHRISTOPHER T.
MCMAHAN,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER & OPINION ON MOTION
TO EXCLUDE EXPERT TESTIMONY**

1.      THIS MATTER is before the Court on Defendants' Motion to Exclude Testimony of Plaintiff's Expert J.C. Poindexter ("Motion") pursuant to Rules 702 and 403 of the North Carolina Rules of Evidence. For the reasons explained below, the Motion is GRANTED IN PART and DENIED IN PART.

> *Enns & Archer LLP, by Rodrick J. Enns, and Lincoln Derr PLLC, by Sara R. Lincoln, for Plaintiff.*

> *Smith Moore Leatherwood LLP, by J. Douglas Grimes and Richard A. Coughlin, for Defendants.*

Gale, Chief Judge.

## I.   INTRODUCTION AND BACKGROUND

2.      This case, set for trial in February 2017, has involved substantial motion practice. The Court provided a detailed statement of the factual background and procedural history in its ruling on Defendants' Motion for Summary Judgment (the

"April 2015 Decision"). *See Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, No. 13-CVS-1037, 2015 NCBC LEXIS 40, at *3–20 (N.C. Super. Ct. Apr. 23, 2015).

3.      Safety Test & Equipment Company, Inc. ("Safety Test") initiated this action on June 12, 2013, alleging claims of misappropriation of trade secrets, defamation, interference with prospective contractual relations, civil conspiracy, and violations of N.C. Gen. Stat. § 75-1.1 (2015). The case was designated a mandatory complex business case on June 13, 2013, and assigned to the undersigned on June 19, 2013.

4.      The litigation arises from Safety Test's claim that American Safety Utility Corporation ("ASUC")—a competitor of Safety Test's—hired former Safety Test employees John E. Hamrick ("Hamrick") and Christopher T. McMahan ("McMahan") in 2011 and 2012 and induced them to misappropriate Safety Test's trade secrets.

5.      In its April 2015 Decision, the Court found adequate evidence to allow the trade-secret-misappropriation claim to survive summary judgment as to three categories of information: (1) Safety Test's supplier pricing, (2) a business strategy of Safety Test's referred to as "OEM sourcing," and (3) Safety Test's historical customer pricing. The defamation claim was voluntarily dismissed, and the remaining claims survive but are dependent on the trade-secret-misappropriation claim.

## II.    SUMMARY OF THE MOTION

6.      The testimony of forensic-economics expert Dr. J.C. Poindexter is critical to Safety Test's case on damages.

7.      The Motion seeks to exclude Dr. Poindexter's testimony in its entirety. Alternatively, Defendants move to exclude the portions of Dr. Poindexter's opinions that they allege are not sufficiently relevant or reliable, or are otherwise unduly prejudicial.

8.      The Motion presents the specific issue of whether Dr. Poindexter may opine as to certain economic circumstances without intending to present or having demonstrated an adequate basis to present an opinion on liability or causation arising from Safety Test's evidence of alleged trade-secret misappropriation.

9.      Dr. Poindexter has prepared reports that state opinions relating to (1) his assessment and projection of sales and profits for certain customers before and after ASUC hired Hamrick and McMahan that he refers to as "diverted sales," and (2) his view that, before ASUC hired Hamrick and McMahan, ASUC was facing insolvency because of continuing losses in equity value.

10.     Safety Test proposes that this testimony is among the circumstantial evidence from which a jury may conclude first, that there was trade-secret misappropriation, and second, that Safety Test suffered economic injury or that ASUC was unjustly enriched because of that misappropriation.   Safety Test is steadfast in its representation that Dr. Poindexter has not been, and will not be, asked to opine as to specific damages that Safety Test has suffered from such trade-secret misappropriation.   Rather, Safety Test contends that Dr. Poindexter's testimony is both a proper subject of expert testimony to assist the jury in its

determination and an appropriate basis of circumstantial evidence from which a jury may infer misappropriation and determine what damages should be assessed.

11. In summary, Defendants contend that Dr. Poindexter's methods of projecting sales and profits are unreliable because an expert who seeks to opine on damages caused by trade-secret misappropriation must consider and account for market forces other than the alleged misappropriation that could be alternative causes for increases or declines in sales or profits. To the extent that Dr. Poindexter seeks to express an opinion on sales or profits before and after ASUC hired Hamrick and McMahan, without assigning changes to any particular factor, Defendants argue that such testimony first is an improper subject of expert testimony, second is unreliable, and third is highly prejudicial.

12. To resolve the Motion, the Court must assess the reliability of Dr. Poindexter's reports and proposed testimony under Rule 702 of the North Carolina Rules of Evidence. Assuming that the reports and testimony pass muster under Rule 702(a), the Court must further assess the relative relevance and prejudice of Dr. Poindexter's opinions under Rules 402 and 403.

## III. LEGAL STANDARDS

### A. The Admissibility of Expert Testimony

13. Rule 702(a) of the North Carolina Rules of Evidence is now virtually identical to its federal counterpart and follows the *Daubert* standard for admitting expert testimony. *See State v. McGrady*, 368 N.C. 880, 884, 787 S.E.2d 1, 5 (2016) ("We hold that the 2011 amendment [to North Carolina's Rule 702] adopts the federal

standard for the admission of expert witness testimony articulated in the *Daubert* line of cases. . . . [and] mirrors that of the amended federal rule."); *see also id.* at 892, 787 S.E.2d at 10 (noting that "[t]he 2011 amendment to Rule 702(a) did not change the basic structure of the inquiry," but that it "did change the level of rigor that our courts must use to scrutinize expert testimony before admitting it").

14. Rule 702(a) has three main parts that must be satisfied for expert testimony to be admissible.

15. First, the testimony must be relevant. Expert testimony is relevant if it is based on "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or determine a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015). The testimony must go beyond meeting the minimum standard for logical relevance established by Rule 401; it must "assist the trier of fact" by providing "insight beyond the conclusions that jurors can readily draw from their own experiences," and "do more than invite the jury to 'substitut[e] [the expert's] judgment of the meaning of the facts of the case' for its own." *McGrady*, 368 N.C. at 889, 787 S.E.2d at 8 (first quoting N.C. Gen. Stat. § 8C-1, Rule 702(a); then quoting *Burrell v. Sparkkles Reconstruction Co.*, 189 N.C. App. 104, 114, 657 S.E.2d 712, 719 (2008)).

16. Second, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." N.C. Gen. Stat. § 8C-1, Rule 702(a).

17. Third, the testimony must be reliable. An expert's opinion is reliable if all the following criteria are met:

- "[t]he testimony is based upon sufficient facts or data,"

- "[t]he testimony is the product of reliable principles and methods," and

- "[t]he witness has applied the principles and methods reliably to the facts of the case."

*Id.* § 8C-1, Rule 702(a)(1)–(3).

18. To determine whether expert testimony is reliable, "[t]he primary focus of the inquiry is on the reliability of the witness's principles and methodology, 'not on the conclusions that they generate.'" *McGrady*, 368 N.C. at 890, 787 S.E.2d at 9 (first citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); then quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)). As the Supreme Court of North Carolina has explained, "the trial court should use those factors that it believes will best help it determine whether the testimony is reliable in the three ways described in the text of Rule 702(a)(1) to (a)(3)." *Id.*

19. In exercising its "gatekeeping role" to ensure that expert testimony meets the criteria set forth above, the Court must be mindful of other applicable rules. *Daubert*, 509 U.S. at 595, 597. Rule 403 permits the exclusion of relevant evidence when the "probative value [of the evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." N.C. Gen. Stat. § 8C-1, Rule 403; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule

403 . . . exercises more control over experts than over lay witnesses." (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))).

### B. Damages for Misappropriation of Trade Secrets

20. Safety Test intends to have Dr. Poindexter testify as to certain economic circumstances that Safety Test contends, combined with other evidence, provides an adequate combination of direct and circumstantial evidence to allow a jury to find that Safety Test has satisfied its statutory burden of showing that Defendants have misappropriated Safety Test's trade secrets, and either that Safety Test has suffered financial loss as a result of that misappropriation, or that Defendants have been unjustly enriched.

21. A plaintiff who succeeds in proving a claim of misappropriation of trade secrets may recover actual damages measured by the greater of economic loss suffered by the plaintiff, or unjust enrichment enjoyed by the defendant as a result of the misappropriation. N.C. Gen. Stat. § 66-154(b) (2015).

22. The North Carolina Pattern Jury Instructions, consistent with the law of proximate cause for other causes of action, directs that a plaintiff must prove only that the defendant's misappropriation of the plaintiff's trade secret was a proximate cause, not the sole cause, of the plaintiff's economic loss or unjust enrichment. N.C. Pattern Jury Instructions–Civil 813.96.

23. Damages are to be reasonably determined from the evidence presented in the case, and must be based on evidence that shows the amount of actual damages

with reasonable certainty. *See Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 547–48, 356 S.E.2d 578, 586 (1987); *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 660, 670 S.E.2d 321, 330 (2009); N.C. Pattern Jury Instructions–Civil 813.98. While absolute certainty as to the amount of actual damages is not required, there must be "something more than 'hypothetical or speculative forecasts.'" *Med. Staffing Network*, 194 N.C. App. at 660, 670 S.E.2d at 330 (quoting *S. Bldg. Maint., Inc. v. Osborne*, 127 N.C. App. 327, 332, 489 S.E.2d 892, 896 (1997)); *see also Castle McCulloch, Inc. v. Freedman*, 169 N.C. App. 497, 501, 610 S.E.2d 416, 420 ("North Carolina courts have long held that damages for lost profits will not be awarded based upon hypothetical or speculative forecasts of losses." (quoting *Iron Steamer, Ltd. v. Trinity Rest., Inc.*, 110 N.C. App. 843, 847, 431, S.E.2d 767, 770 (1993))), *aff'd*, 360 N.C. 57, 620 S.E.2d 674 (2005); N.C. Pattern Jury Instructions–Civil 813.98.

24. Where the evidence demonstrates that multiple reasons unrelated to the defendant's trade-secret misappropriation might account for or contribute to the plaintiff's economic losses or the defendant's unjust enrichment, it would be inappropriate for an expert to present an opinion of damages based only on the assumption, without analysis, that all the plaintiff's economic loss or all the defendant's economic gain was caused by the defendant's alleged wrongful misappropriation. *Med. Staffing Network*, 194 N.C. App. at 660–61, 670 S.Ed.2d at 330 (citing *Olivetti*, 319 N.C. at 548, 356 S.E.2d at 587). Otherwise, an expert's opinion would rest on a "faulty premise." *Id.* at 661, 670 S.E.2d at 330. This is because the ultimate determination of damages must take into account all relevant

factors when determining a final value that is reasonably certain. *Id.* (citing *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 411–12, 466 S.E.2d 324, 332 (1976)).

25. Likewise, an expert opinion expressing that certain economic losses or gains were caused by the defendant's misappropriation of trade secrets rests on a faulty premise if the opinion rests entirely on the assumption that losses or gains were due solely to the alleged misappropriation, without further evidentiary analysis that supports that assumption. *See, e.g.*, *Polyzen, Inc. v. RadiaDyne, LLC*, No. 5:11-CV-662-D, 2016 U.S. Dist. LEXIS 130888, at *38–39 (E.D.N.C. Sept. 23, 2016), *appeal docketed*, No. 17-1174 (Fed. Cir. Nov. 8, 2016). A conclusion that an expert opinion rests on a faulty premise is essentially a finding that the opinion is unreliable under Rule 702(a).

## IV.    DR. POINDEXTER'S EXPERT REPORTS AND OPINIONS

26. Dr. Poindexter submitted his initial expert report, entitled "An Assessment of Economic Damages," on May 21, 2014 ("May 2014 Report"). (Defs.' Mot. Exclude Ex. B ("May 2014 Report").) He gave deposition testimony regarding his opinions on July 1, 2014, and prepared two supplemental reports. The first supplemental report was prepared on June 13, 2015, (Defs.' Mot. Exclude Ex. E ("June 2015 Suppl."),) and the second on January 11, 2016, (Defs.' Mot. Exclude Ex. F ("Jan. 2016 Suppl.").) The supplemental reports did not change the basic methodology used in Dr. Poindexter's May 2014 Report. Dr. Poindexter issued the first supplement as a correction to conform to evidence in discovery, (*see* June 2015

Suppl. 2,) and the second to reflect his understanding of data from one account and to offer recalculations that became necessary due to the passage of time, (*see* Jan. 2016 Suppl. 2.)

27.    Dr. Poindexter has substantial education, training, background, and experience in economics, and has been qualified frequently by courts to present expert testimony.  Defendants do not premise their Motion on an attack of Dr. Poindexter's qualifications or credentials.  Rather, their attack is on Dr. Poindexter's methodology, and specifically, his failure to consider and account for other market forces that may have accounted for and caused the various financial circumstances and changes that form the basis of his opinions.  Defendants contend that, even if Dr. Poindexter's analysis could be deemed marginally reliable, the potential relevance of his opinions is substantially outweighed by their prejudicial effect.

28.    Safety Test asserts that Dr. Poindexter does not intend to opine as to liability or causation.  However, he clearly refers to his analysis as an assessment of "damages."  He says that his engagement in this lawsuit is "to provide [his] expert analysis and resulting opinion(s) with regard to damages." (May 2014 Report 2.)  He explains that his "requested analysis stems from damaging actions described in detail [in the] Complaint," and that "[t]he focus of [his] analytical efforts is on business accounts that Plaintiff contends were illegally diverted (away from Safety Test and to ASUC) as a direct result of improper actions by named defendants in the case." (May 2014 Report 2.)

29. Dr. Poindexter isolated certain accounts that Hamrick and McMahan serviced both at Safety Test and at ASUC, as well as a limited number of "unassigned" accounts. (May 2014 Report 2.) In addition to relying on raw data furnished by ASUC in discovery, Dr. Poindexter relied on his "informed judgment in identifying diverted sales and attendant lost profits (and the corollary unjust enrichment of defendants)." (May 2014 Report 2.)

30. He also assessed ASUC's business performance before and after Hamrick and McMahan were hired, and referred to "the dramatic changes in ASUC['s] business performance in concert with that company's alleged aggressive attack on Safety Test," based on an "analysis [that] traces the operational performance of ASUC over the years 2005 through 2013 to identify changes in profitability that can be claimed to be the result of ASUC's injurious actions." (May 2014 Report 3.)

31. As to his assessment of sales for particular customers, or incremental sales lost by Safety Test and gained by ASUC, Dr. Poindexter reviewed the overall sales data for customers serviced by both Safety Test and ASUC for the period after Hamrick and McMahan joined ASUC. Dr. Poindexter labeled those sales "diverted" new or incremental sales, and calculated the profits that Safety Test lost from those diverted sales. (May 2014 Report 3.) He reported his calculations on an account-by-account basis and prepared separate tables for total diverted sales in which he associated Safety Test's lost profits for customers assigned to Hamrick, customers assigned to McMahan, and customers who were "unassigned." (May 2014 Report

Tables 1–3.) He prepared a fourth table that reflects the combined totals from the first three tables. (May 2014 Report Table 4.) Dr. Poindexter then projected further diverted sales and associated Safety Test's lost profits using a three-year decay period and discounting based on a calculated capitalization rate.

32. As to his assessment of ASUC's overall economic condition before and after the period in which Safety Test contends that the trade-secret misappropriation began, Dr. Poindexter reviewed ASUC's sales for the period between 2005 and 2013, which included data for the years after Hamrick and McMahan joined ASUC. Dr. Poindexter opined that ASUC had suffered significant losses in the years before it hired Hamrick and McMahan, and that performance in those years represented a consequential loss in ASUC's equity value that could not be sustained and would have led to ASUC's failure. He opines that ASUC had "a compelling need to find a way to stop the company's rush toward bankruptcy." (May 2014 Report 5.) In addition to their motion to exclude Dr. Poindexter's testimony in whole, Defendants have filed a separate motion in limine to prevent that statement from being introduced at trial, even if Dr. Poindexter is otherwise allowed to testify.

33. In addition to quantifying sales and correlated profits and opining as to ASUC's business risks, Dr. Poindexter states that

> ASUC's financial history conforms to what is alleged in the complaint in this case and is supportive of allegations of illegal ASUC actions alleged in the case. Indeed, in terms of time patterns of events, ASUC's years of rapid decline correlate precisely with pressures to "buy accounts" by hiring in collaborative Safety Test personnel and by other actions to acquire and use Safety Test proprietary information. Of course, the timing of ASUC recovery correlates precisely with the employment of

Hamrick and McMahan and the acquisition of and reliance on other proprietary Safety Test information.

(May 2014 Report 5.)

34. Finally, Dr. Poindexter calculates ASUC's increased profitability in the years after it hired Hamrick and McMahan. He refers to this increased profitability as "profitability improvement (enrichment) enjoyed by ASUC" and "continuing unjust enrichment." (May 2014 Report 6.) Notably, Dr. Poindexter's analysis is not tied only to the sales accounts serviced by both Safety Test and ASUC, but is based on ASUC's overall performance in the period after it hired Hamrick and McMahan.

35. The first supplemental report followed the same methodology as the May 2014 Report, but adjusted the data set to exclude one customer, and modified profit calculations to account for sales commissions.

36. The second supplemental report followed the same methodology, but changed the data set for one customer, and modified the calculations of past and future profit figures to account for the passage of time.

37. Defendants' Motion rests on the central premise that an expert may opine as to damages caused by trade-secret misappropriation only if the expert fairly accounts for other causes that contributed to losses or gains in sales and profits. They contend that, because Dr. Poindexter made no effort to fairly account for other contributing causes, his opinions cannot be squared with the requirements of Rule 702(a). They further contend that, in characterizing his determinations as "damages," Dr. Poindexter necessarily but improperly assumes a causal connection between his calculations and the alleged misappropriation, and that doing so without

further analysis is unreliable, speculative, and not relevant. Further, Defendants claim that, because his determinations are devoid of a foundation, any potential relevance that his opinions might have to issues of liability is substantially outweighed by the manifest prejudice that Defendants would suffer if Dr. Poindexter is permitted to present his opinions to the jury at trial.

38. In opposing the Motion, Safety Test emphasizes that Dr. Poindexter has not, and will not, express any opinion on liability or causation, but will present only evidence that will assist the jury in making its own determination of whether misappropriation occurred and what damages or unjust enrichment were caused by any misappropriation that it finds. Further, Safety Test contends that, because Dr. Poindexter expresses no opinion on either liability or causation, Safety Test is not inviting the jury to substitute Dr. Poindexter's opinion on liability or causation for its own.

## V. ANALYSIS

39. The parties define Dr. Poindexter's opinions on sales and profits attributed to specific customers served by both Safety Test and ASUC in the relevant time period in a critically distinct way. Defendants contend that by including "diverted" sales in his damages calculations, Dr. Poindexter necessarily expresses an opinion on causation by assuming a proximate causal link between sales and the alleged misappropriation. They contend that the North Carolina Court of Appeals makes clear in *Medical Staffing Network, Inc. v. Ridgway* that an expert cannot express an assumption on causation without first becoming informed of and

accounting for potential alternative causes for sales and profits unrelated to the alleged misappropriation documented by the evidence. 194 N.C. App. at 660–61, 670 S.E.2d at 330.

40. Safety Test counters that Defendants cannot fairly apply the holding in *Medical Staffing Network*, because Dr. Poindexter does not express an opinion on Safety Test's actual loss or Defendants' actual gain from such sales or profits; rather, Safety Test claims, Dr. Poindexter presents an evidentiary basis from which a jury might reach such a conclusion based on a combination of Dr. Poindexter's opinions and other record evidence. In reply, Defendants argue that if this is the limited purpose of Dr. Poindexter's testimony, his testimony is not "expert" testimony, because it does no more than provide facts and figures based on identified customer files. Safety Test rejoins that expert analysis was required to isolate the diversion or accretion in sales and to calculate and project present and future revenues and profits associated with that diversion or accretion.

41. The Court first addresses the category of Dr. Poindexter's opinions that compare total revenues or specific customer sales before and after ASUC hired Hamrick and McMahan, and then addresses Dr. Poindexter's opinions that assess ASUC's overall revenues before and after Hamrick and McMahan were hired.

## A. Dr. Poindexter's Analysis of ASUC's Customer Accounts

42. Relying on *Medical Staffing Network*, Defendants assert that it is inappropriate to measure any unjust enrichment attributed to Defendants' alleged misappropriation by examining ASUC's total revenues rather than examining only

those revenues that could reasonably be attributed to sales that a jury might find to be associated with the alleged misappropriation.

43. The Court accepts Safety Test's assurance that Dr. Poindexter will not be asked to opine as to Defendants' liability for trade-secret misappropriation or to the extent of damages actually caused by any misappropriation, and the Court will take necessary steps to hold Safety Test to that assurance. Under *Medical Staffing Network*, Dr. Poindexter would be required to consider and account for alternative causes if he intends to offer an opinion on actual damages or on the unjust enrichment actually caused by Defendants' alleged misappropriation. This requirement is not tantamount to requiring Safety Test to prove that any misappropriation was the *sole* cause of economic changes. Rather, an opinion on actual damages or unjust enrichment caused by an alleged trade-secret misappropriation that does not account for alternative causes would be speculative and thus would rest on a faulty premise.

44. The Court concludes that portions of Dr. Poindexter's testimony may be a proper subject of expert testimony, even though he does not intend to express an opinion on liability or causation, and that his presentation of sales, revenues, and related profits gained or lost for identifiable isolated customers, without further opining as to the cause for such revenues and profits, should not, at least at this time, be excluded under Rule 702(a). The Court preliminarily concludes that Dr. Poindexter's expert testimony on lost profits is necessary and appropriate to assist the jury in understanding and assessing the parties' changing economic circumstances as a part of the evidence from which it will conclude whether there

was trade-secret misappropriation in the first instance, and if so, the result of that misappropriation.

45. The Court further concludes, subject to a final determination based on the evidence presented at trial, that Dr. Poindexter's opinions are based on sufficient facts or data, and result from reliable methodology and application, as long as Dr. Poindexter does not seek to testify about the cause for the revenues and related profits characterized as either damages or unjust enrichment. Accordingly, the Court declines to exclude Dr. Poindexter's opinions on reliability grounds under Rule 702(a).

46. However, the Court's analysis does not end at the Rule 702 inquiry. The Court must further consider whether the testimony should be excluded or limited under Rule 403 on the grounds that the probative value of the testimony is outweighed by its potential prejudicial effect. The Court concludes that Dr. Poindexter's written reports cannot be admitted in their current form, and that his testimony cannot use certain terms embodied in those reports.

47. Dr. Poindexter's reports include language that the Court concludes, in its discretion, should not be permitted, because the language is unnecessary to his opinions and presents the potential for undue prejudice adequate to exclude the reports under Rule 403.

48. For example, Dr. Poindexter should not be allowed to characterize or refer to the economic changes that he presents either as "damages" or as "unjust enrichment." The Court concludes that the use of those terms in testimony before the jury would implicitly cause a jury to conclude that Dr. Poindexter expresses an

opinion on causation. Dr. Poindexter's testimony, whether written or oral, should not include those terms. Rather, Dr. Poindexter's language should be consistent with Safety Test's assurance that Dr. Poindexter has been asked only to isolate changes that he has determined as to customers before and after ASUC hired Hamrick and McMahan. He can appropriately use the terms "profit" and "profit margin" when he presents his opinions on profits from sales, as long as gains or losses in sales are not referred to as "damages," "unjust enrichment," or similar terms that imply liability or causation.

49. Dr. Poindexter's reports include other phrasing that is inappropriate and unnecessary for expert testimony that does not opine as to liability or causation. For example, he uses the phrase "illegally diverted" when he characterizes customer accounts. (May 2014 Report 2.) He testifies that ASUC's finances are "supportive of allegations of illegal ASUC actions." (May 2014 Report 5.) The Court reserves determination of whether to allow use of the term "diverted" sales. The Court will not allow Dr. Poindexter to say that customer accounts or sales were diverted "illegally." (May 2014 Report 2.)

50. Likewise, Dr. Poindexter's May 2014 Report crosses into an area that suggests an opinion on causation when he refers to "[r]esulting projected sales losses due to diversion of accounts by defendants." (May 2014 Report 4.) The Court further notes that Dr. Poindexter also uses the significantly more neutral phrasing "new sales or incremental sales." (May 2014 Report 3.) Likewise, when he refers to statements from the complaint, Dr. Poindexter refers to ASUC's "aggressive attack

on Safety Test." (May 2014 Report 3.) In Dr. Poindexter's limited role as an expert witness assessing economic circumstances, he should not be allowed to engage in these characterizations.

B. Dr. Poindexter's Analysis of ASUC's Financial Performance

51. The Court now considers Dr. Poindexter's opinions relating to ASUC's overall financial performance before and after ASUC hired Hamrick and McMahan. The Court again understands that Safety Test does not intend for Dr. Poindexter to assign causation to ASUC's financial performance. Rather, Safety Test intends for Dr. Poindexter to opine on ASUC's deteriorating financial conditions prior to its hiring of Hamrick and McMahan, including his opinion that the deteriorating financial conditions would have led to failure for ASUC if it had not experienced significant changes in business performance, and that ASUC enjoyed a positive financial change after Hamrick's and McMahan's hiring dates.

52. The Court preliminarily concludes that Dr. Poindexter's analysis is a proper subject of expert opinion and that his opinions are based on reliable methodology and application, as long as he does not opine or imply as to the causes of ASUC's aggregate performance. The Court defers its final determination whether to allow Dr. Poindexter to present these opinions until trial, after Safety Test has presented other foundation evidence.

53. That said, the Court again concludes, in its discretion, that Dr. Poindexter's reports include language and statements that should be excluded under

Rule 403 because the probative value of his testimony is substantially outweighed by the danger of undue prejudice and may mislead the jury.

54.     The Court preliminarily concludes that, subject to a proper evidentiary foundation established at trial, Dr. Poindexter may be allowed to present his assessment of the overall declines or increases in sales revenues and equity value during the years that he considered in his analysis. (*See* May 2014 Report Table 6.) At this time, the Court rejects Defendants' argument that the Court should exclude Dr. Poindexter's testimony on the basis that his opinions fail to properly consider ASUC's change to a subchapter-S corporation and corresponding changes in reported losses or revenues, either internal or in tax returns. The Court further preliminarily concludes, subject to the same issue of a proper evidentiary foundation, that Dr. Poindexter may be allowed to express an opinion that the trend in ASUC's decline in equity value created the potential for an overall business failure if that trend was not reversed.

55.     However, it does not follow that Dr. Poindexter should be allowed to express an opinion that the positive changes that ASUC enjoyed in the years following its hiring of Hamrick and McMahan constituted "damages" to Safety Test or "unjust enrichment" to ASUC, or that the years after 2011 should be considered a "damages period." Characterizing an increase in revenue, profitability, or equity value as "unjust enrichment"—or even just as "enrichment"—implies a proximate causal link between those figures and Defendants' alleged misappropriation or improper conduct. While Dr. Poindexter may ultimately be allowed to present

financial figures that the jury can use to form its conclusions, determining whether those changes were "unjust" is a matter outside the express limitations of Dr. Poindexter's opinions, based on Safety Test's assurances to the Court.

56.     The Court may ultimately conclude, subject to a proper evidentiary foundation at trial, that the presentation of "before and after" aggregate-revenue numbers is appropriate circumstantial evidence for the jury to consider in determining the issue of trade-secret misappropriation. *See Med. Staffing Network*, 194 N.C. App. at 658–59, 670 S.E.2d at 329.  However, it now concludes that it would be inappropriate for Dr. Poindexter to opine that Safety Test has suffered losses or damages, or that ASUC has enjoyed an unjust gain, based solely on evidence of cumulative sales, revenues, or profits that does not purport to isolate the effect of specific customer accounts in an instance where there may be some evidentiary basis to assume that Defendants misappropriated trade secrets. *See id.* at 660–61, 670 S.E.2d at 330.

57.     Evidence of a defendant's aggregate sales cannot alone serve as the basis for an award of damages for trade-secret misappropriation. *See id.* The Court defers its determination of whether it may be necessary for the Court to issue a further limiting instruction to the jury, either at the time that Dr. Poindexter offers his opinions or as part of the final jury instructions regarding Safety Test's burden of proof for damages.

## VI. CONCLUSION

58. For the foregoing reasons, the Motion is GRANTED IN PART and DENIED IN PART. The Court does not at this time exclude Dr. Poindexter as an expert witness pursuant to Rule 702(a). However, the Court concludes, in its discretion, that Dr. Poindexter's testimony and his written reports that Safety Test may seek to introduce shall be limited in accordance with this Order & Opinion, or as otherwise necessary to avoid undue prejudice.

SO ORDERED, this the 16th day of December, 2016.

/s/ James L. Gale
James L. Gale
Chief Business Court Judge