InVue Sec. Prods., Inc. v. Stein, 2017 NCBC 113.

| | |
|---|---|
| STATE OF NORTH CAROLINA<br><br>MECKLENBURG COUNTY | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION<br>17 CVS 19774 |
| INVUE SECURITY PRODUCTS, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>PHILLIP K. STEIN; and SCORPION SECURITY PRODUCTS, INC.,<br><br>        Defendants. | **ORDER AND OPINION ON DEFENDANT STEIN'S MOTION TO DISMISS AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

1. After being employed by Plaintiff InVue Security Products, Inc. ("InVue") for more than a decade, Defendant Philip K. Stein resigned his employment in August 2017. Stein then accepted a similar position with Defendant Scorpion Security Products, Inc. ("Scorpion"), one of InVue's direct competitors. In this action, InVue alleges that Stein, in his new employment, has breached and is continuing to breach agreements that restrict his use of InVue's confidential information and that contain covenants not to compete with InVue or to solicit its customers.

2. InVue moves for a preliminary injunction to enforce these agreements. In response, Stein contends the non-competition and non-solicitation covenants are facially invalid and moves to dismiss the claim for breach of the covenants under North Carolina Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** both motions.

*Johnston, Allison & Hord, P.A., by Patrick E. Kelly and Michael J. Hoefling, for Plaintiff.*

*James, McElroy & Diehl, P.A., by Jon P. Carroll and Adam L. Ross, for Defendant Phillip K. Stein.*

Conrad, Judge.

## I.
## PROCEDURAL HISTORY

3.      On October 26, 2017, InVue filed its verified complaint along with motions for a temporary restraining order and for a preliminary injunction.  The Honorable Robert C. Ervin granted a temporary restraining order to enjoin "Stein from soliciting InVue clients, customers, and employees."  (TRO at 1, ECF No. 17.)  Judge Ervin denied all other requested relief on the grounds that InVue "failed to demonstrate a likelihood of success on the merits or that irreparable harm will occur absent the issuance of injunctive relief."  (TRO at 2.)

4.      On November 8, InVue filed an amended verified complaint ("Amended Complaint"), including an amended motion for preliminary injunction.  The Amended Complaint incorporates (but does not re-state) the original complaint's allegations and amends paragraph 63 to incorporate by reference several affidavits attached as exhibits.  (Am. V. Compl., ECF No. 4.)  For ease of reference, this Opinion cites the numbered allegations in the original complaint.  (V. Compl., ECF No. 3.)

5.      Stein filed his motion to dismiss on November 9.  The case was then designated as a complex business case, after which the parties jointly tendered, and the Court adopted, a Consent Order extending the temporary restraining order pending a hearing on InVue's motion for preliminary injunction and Stein's motion to dismiss.  (Consent Order, ECF No. 24.)  The parties further agreed to a shortened briefing schedule for both motions, which are now fully briefed.  (Consent Order.)

6. Stein also filed an objection and motion to strike the affidavits attached to the Amended Complaint, arguing they were filed too late and therefore could not support the motion for preliminary injunction. (*See* Obj. & Mot. to Strike, ECF No. 12.) In subsequent briefing, Stein withdrew the timeliness objection and instead requested that the Court strike limited portions of the affidavits on hearsay and related grounds. (*See* Br. in Supp. Obj. & Mot. to Strike, ECF No. 29.) This motion is also fully briefed.

7. The Court held a hearing on the pending motions on December 14, 2017. The motions are ripe for disposition.

II.
BACKGROUND

8. For purposes of Stein's motion to dismiss, the Court assumes the facts alleged in the Amended Complaint to be true. As to InVue's motion for preliminary injunction, the Court considers the Amended Complaint and the additional evidence submitted by the parties in determining whether InVue has carried its burden. Any findings in that regard are solely for purposes of the preliminary-injunction motion and are not binding at a later stage.

A. Stein's Employment with InVue

9. InVue manufactures, sells, and distributes "anti-theft devices and related goods for use by the retail industry." (V. Compl. ¶¶ 7.) As relevant here, InVue's customers include retailers of mobile phones, electronics, and similar products that must be secured to prevent or deter theft. (V. Compl. ¶ 13; Aff. of Galleberg ¶ 2, ECF No. 4 Ex. G.)

10.  InVue hired Stein in 2006.  (V. Compl. ¶ 8.)  Apart from a two-year stint as a Senior Product Manager, Stein spent most of the next decade as one of InVue's National Account Managers.  (V. Compl. ¶¶ 8–11.)  In this role, Stein developed relationships with key customers, promoted InVue's products, and helped develop InVue's marketing strategies.  (V. Compl. ¶ 9.)  Stein's position also gave him access to sensitive business information, including "InVue's books and records, customer lists, business plans and practices," and related information.  (V. Compl. ¶ 40.)

11.  Stein managed several of InVue's customer accounts, including Verizon Wireless, Cricket, Staples, and AT&T.  (V. Compl. ¶¶ 11, 13.)  These customers have "stores and regional managers throughout the entire United States."  (V. Compl. ¶ 13.)  As a result, Stein traveled extensively and developed contacts with customers across the country.  (*See* V. Compl. ¶¶ 12, 14.)

## B.  The Employment Agreements

12.  During the course of his employment, Stein entered into several agreements with InVue.  (V. Compl. ¶¶ 15, 21, 22.)  Stein executed a Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") in December 2010.  (V. Compl. ¶ 15, Ex. A.)  This agreement prohibits Stein from "divulging, furnishing, copying, taking, using or allowing access to" InVue's confidential information.  (V. Compl. ¶ 16.)

13.  In June 2011, InVue informed Stein that his participation in a stock appreciation plan entitled him "to a cash payment in exchange for his execution" of "covenants not to solicit InVue's customers or employees [and] not to compete with

InVue for an 18 month period following the termination of his employment with InVue for any reason." (V. Compl. ¶¶ 18, 20.) Stein agreed and, in July 2011, signed a document entitled "Cash Award Under the Amended and Restated Stock Appreciation Plan." (V. Compl. ¶ 21, Ex. C at 1.) InVue then provided a cash payment. (V. Compl. ¶¶ 23, 28.)

14. The non-competition covenant states that, for a period of 18 months following his termination, Stein shall not:

> anywhere (i) within the United States of America ("Territory") or (ii) within any State within the United States of America in which Employee has directly or indirectly engaged in the Business as defined below, while employed by the Company, work as an employee, officer, agent, director, representative, consultant, stockholder, partner or proprietor for any business which engages in the manufacture, sale or distribution of theft reduction devices for use by the retail industry ("Business").

(V. Compl. Ex. C at 2.)

15. In the non-solicitation covenant, Stein further agreed that, during the same period following termination, he would not:

> directly or indirectly contact or solicit the clients or customers of the Company in the Territory with whom the Employee or Company has done Business at any time in the twelve (12) month period preceding Employee's termination of employment or who is or has been a client or customer of the Company in the twelve (12) months preceding termination, or who were made known to the Employee through employment with the Company, for the purpose of inducing the client or customer to terminate or modify its relationship with the Company.

(V. Compl. Ex. C at 2–3.) Stein also agreed not to contact or solicit InVue's employees during the same period. (*See* V. Compl. Ex. C at 3.)

## C. Stein's Alleged Solicitation of InVue's Customers

16. Stein resigned from InVue on August 18, 2017. (V. Compl. ¶ 29.) A few days later, he began working for Scorpion, "a direct competitor of InVue." (V. Compl. ¶¶ 31–32, 43.) According to InVue, "Stein performs the same or similar tasks and duties as he performed while employed by InVue and is selling competing products, directly or indirectly to InVue's customers." (V. Compl. ¶ 35.)

17. In its Amended Complaint, InVue generally alleges that Stein has solicited business from several customers with which he developed contacts while at InVue, including Verizon Wireless, Spring Communications, and Prime Communications. (*See* V. Compl. ¶ 36.) However, most of the allegations and supporting affidavits relate to Stein's solicitation of Verizon Wireless, specifically including Stein's visit to its corporate offices in September 2017. (*See* V. Compl. ¶¶ 51–55.) There is no dispute Stein made this visit, but the parties sharply dispute its purpose and effect.

18. According to InVue, Stein sought to induce Verizon Wireless to terminate or modify its relationship with InVue. In their affidavits, InVue's employees testify that they encountered Stein on site at Verizon Wireless, after which "Stein asked them not to tell anyone else at InVue that they had seen him there." (V. Compl. ¶ 53.) InVue contends that Stein marketed a software theft-reduction device that directly competes with InVue's own products. (*See* Aff. of Grant ¶ 17.c., ECF No. 38.) Furthermore, InVue asserts that Verizon Wireless is one of its largest accounts, which, if terminated, would result in substantial losses. (Aff. of Edwards ¶ 5, ECF No. 4 Ex. H; Aff. of Grant ¶ 19.)

19. In opposition to the motion for preliminary injunction, Stein acknowledges that he met with Verizon Wireless. (2d Aff. of Stein ¶ 22, ECF No. 42.) He states, however, that he "focused on marketing Scorpion's SWIS software application," which he characterizes as a "software application" that is not a "theft reduction device." (2d Aff. of Stein ¶ 19.) According to Stein, SWIS does not compete with any InVue product. (2d Aff. of Stein ¶ 20; *see also* Aff. of Thakral ¶ 7, ECF No. 43.)

## D. This Action

20. InVue asserts two claims for breach of contract against Stein: first, that he has breached the non-competition and non-solicitation covenants; and second, that he has breached the Confidentiality Agreement. These claims are the subject of InVue's motion for preliminary injunction. InVue also asserts a claim against Scorpion for tortious interference with contract.

## III.
## STEIN'S MOTION TO DISMISS

21. In his motion to dismiss, Stein argues that the covenants not to compete with InVue and not to solicit InVue's customers are facially invalid. If Stein prevails, the claim for breach of contract must be dismissed, and InVue would not be entitled to a preliminary injunction enforcing the covenants. The Court therefore addresses these threshold issues first.

## A. Legal Standard

22. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). "Dismissal of a complaint under Rule 12(b)(6) is proper when

one of the following three conditions is satisfied: (1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint on its face reveals the absence of fact sufficient to make a good claim; (3) when some fact disclosed in the complaint necessarily defeats plaintiff's claim." *Jackson v. Bumgardner*, 318 N.C.172, 175, 347 S.E.2d 743, 745 (1986).

23. In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the non-moving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). "[T]he court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001). In addition, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers," without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204, 652 S.E.2d 701, 707 (2007) (quoting *Oberlin Capital*, 147 N.C. App. at 60, 554 S.E.2d at 847).

## B. Analysis

24. Under North Carolina law, a restrictive employment covenant must be "(1) in writing; (2) made part of a contract of employment; (3) based on valuable consideration; (4) reasonable both as to time and territory; and (5) not against public policy." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649–50, 370 S.E.2d 375, 380

(1988). If the covenant is wider in scope than is necessary to protect the business of the employer, "it will not be enforced." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004).

25. This Court has recognized that "the elements are the same for non-competition and non-solicitation clauses." *Kinston Med. Specialists, P.A. v. Bundle*, 2015 NCBC LEXIS 48, at *11 (N.C. Super. Ct. May 7, 2015) (internal quotation marks omitted). Nevertheless, in applying these elements, North Carolina courts do not view non-competition clauses favorably but are more willing to enforce non-solicitation clauses. *See, e.g.*, *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 282, 530 S.E.2d 878, 881 (2000); *see also Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *25 (N.C. Super. Ct. Aug. 1, 2016); *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *29, 31 (N.C. Super. Ct. Nov. 3, 2011).

1. Non-Competition

26. Stein contends that the non-competition covenant is facially unenforceable for two reasons: first, it is unreasonable as to time and territory; and second, it is broader than necessary to protect InVue's legitimate business interests. (Br. in Supp. Stein's Partial Mot. to Dismiss 6–9 ["Stein Br."], ECF No. 28.) The Court agrees with Stein's second argument and therefore need not address the first.

27. Our courts have recognized that an employer has a legitimate interest in protecting "customer relationships and goodwill against misappropriation by departing employees." *Kuykendall*, 322 N.C. at 651, 370 S.E.2d at 381. But the

restriction must be "no wider in scope than is necessary to protect the business." *VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d at 362. The North Carolina Court of Appeals and this Court routinely hold that non-competition covenants are overbroad, and therefore unenforceable, when they "prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009); *see also VisionAIR*, 167 N.C. App. at 508, 606 S.E.2d at 362; *CopyPro, Inc. v. Musgrove*, 232 N.C. App. 194, 203, 754 S.E.2d 188, 194 (2014).

28. Here, the non-competition covenant prohibits Stein from working "as an employee, officer, agent, director, representative, consultant, stockholder, partner or proprietor for any business which engages in the manufacture, sale or distribution of theft reduction devices for use by the retail industry." (V. Compl. Ex. C at 2.) The only exception is that Stein may own up to one percent of a publicly traded company in the industry or shares of mutual funds with an interest in such businesses. (*See* V. Compl. Ex. C at 2.)

29. These restrictions are facially overbroad and not tailored to protect InVue's legitimate business interests. As Stein correctly observes, the clause effectively prohibits Stein from taking *any* employment with a competitor—even if his duties are unrelated to those he performed for InVue. (*See* Stein Br. 7.) It also appears to sweep in employment with *non-competitors*. The language "engage[d] in the manufacture, sale or distribution of theft reduction devices for use by the retail

industry" is broad enough to capture businesses (such as Amazon.com) that InVue certainly could not consider a competitor.

30. Such restrictions are indistinguishable from others this Court has found unenforceable in considering a motion to dismiss. *See Sandhills*, 2016 NCBC LEXIS 61, at *15; *Akzo*, 2011 NCBC LEXIS 42, at *42. In *Sandhills*, for example, the employees were prohibited from "work[ing] for, provid[ing] services for, consult[ing] with, or otherwise assist[ing] any individual or entity who is in the home health or personal care business competing with the Employer." *Sandhills*, 2016 NCBC LEXIS at * 15. The Court held that this non-compete was "overly broad because it effectively prohibits the Former Employee Defendants from obtaining employment with any other company in the home health business in any North Carolina county in which the Plaintiff provides services." *Id.* at *15, 17 (granting motion to dismiss). Similarly, in *Akzo*, the Court held invalid a provision that would have prevented the employee "from working for a competitor in the wood coatings industry in a position wholly outside the scope of his" previous employment. *Akzo*, 2011 NCBC LEXIS 42, at *42–43 (granting motion to dismiss); *see also Aeroflow Inc. v. Arias*, 2011 NCBC LEXIS 21, at *18 (N.C. Super. Ct. July 5, 2011) (holding similar covenant "unenforceable as a matter of law" in context of a motion for preliminary injunction).

31. InVue does not dispute the fact that the non-competition covenant would prohibit Stein from working in any capacity for a competitor. Instead, InVue argues that such a restriction is reasonable if the employee "would feel the same pressure to disclose competitive information" "no matter what capacity or position he worked in."

(InVue's Br. in Resp. 16.)  For that proposition, InVue relies heavily on *Precision Walls, Inc. v. Servie*, 152 N.C. App. 630, 568 S.E.2d 267 (2002).

32.    As numerous courts have explained, the holding of *Precision Walls* is narrow and confined to its unique facts.  *See, e.g.*, *CopyPro*, 232 N.C. App. at 203, 754 S.E.2d at 194 (concluding "that *Precision Walls* does not control the outcome in this case"); *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 566, 754 S.E.2d 852, 857 (2014) (deciding that *Precision Walls* was "largely inapposite" to the case before it); *VisionAIR*, 167 N.C. App. at 509 & n.1, 606 S.E.2d at 362–63 & n.1 (distinguishing *Precision Walls*); *see also Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 675 (M.D.N.C. 2009) (following *VisionAIR* and distinguishing *Precision Walls*); *NDSL, Inc. v. Patnoude*, 914 F. Supp. 2d 885, 898 & n.6 (W.D. Mich. 2012) (deeming "broad language" in *Precision Walls* to be "dicta").  Whatever else *Precision Walls* may stand for, it plainly does not support enforcing a nationwide restriction on employment of any kind with competitors (and even some non-competitors) in a given industry.

33.    As discussed, the Court perceives no meaningful difference between the non-competition covenant in this case and those in *VisionAIR*, *Sandhills*, *Akzo*, and similar decisions.  Adhering to the views expressed in these decisions, the Court concludes that "the noncompetition agreement at issue here is much broader than is necessary to protect [InVue's] legitimate business interests and is, for that reason, unenforceable."  *CopyPro*, 232 N.C. App. at 204, 754 S.E.2d at 195.  Accordingly, the

Court grants Stein's motion to dismiss the claim for breach of contract to the extent it is based on the covenant not to compete.

2. Non-Solicitation

34.     Stein also argues that the non-solicitation covenant is facially invalid. He contends that the covenant improperly prevents him from soliciting InVue customers with which he did not have direct contact during his employment. (*See* Stein Br. 16.) Although Stein correctly characterizes the scope of the covenant, he does not cite any case granting a motion to dismiss on this basis, and the Court cannot conclude that this covenant is overbroad as a matter of law at the pleading stage.

35.     Indeed, North Carolina courts have enforced non-solicitation clauses even when the restrictions are not limited to clients or customers with whom the employee had direct contact. *See, e.g.*, *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 229, 393 S.E.2d 854, 857–58 (1990) (concluding that the restriction that prevented the employee from soliciting the company's customers was reasonable); *see also Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 147 N.C. App. 463, 469, 556 S.E.2d 331, 335–36 (2001). So long as the complaint pleads some basis to support such a broad restriction, dismissal under Rule 12(b)(6) would be premature. *See Kinston Med. Specialists, P.A. v. Bundle*, 2015 NCBC LEXIS 48, at *11–12 (N.C. Super. Ct. May 7, 2015) (denying motion to dismiss); S*andhills*, 2016 NCBC LEXIS 61, at *27–28 (same).

36.     InVue's Amended Complaint alleges that Stein was a National Accounts Manager for roughly a decade. (*See* V. Compl. ¶ 8.) In that role, Stein held

responsibility for numerous accounts with customers having a nationwide footprint. (*See* V. Compl. ¶¶ 11–13.) He developed existing client relationships while also identifying new customer opportunities, evaluating general market conditions, and assisting in developing InVue's business strategy. (*See* V. Compl. ¶ 9.) Furthermore, InVue alleges that Stein's position gave him access to "customer lists," "business plans," and related materials. (V. Compl. ¶ 40.)

37. In light of these allegations, "[a]t this very early stage of the case and based upon the pleadings alone, the Court cannot conclude" that the non-solicitation covenant "is unreasonable simply because it prohibits [Stein] from soliciting customers with whom [he] may not have had personal contact during employment" with InVue. *Sandhills,* 2016 NCBC LEXIS 61, at *27–28. The Court therefore denies Stein's motion to dismiss the claim for breach of contract to the extent it is based on the non-solicitation covenant.

IV.
INVUE'S MOTION FOR PRELIMINARY INJUNCTION

38. InVue seeks a preliminary injunction as to the non-competition covenant, the non-solicitation covenant, and the Confidentiality Agreement. Because the Court has dismissed the claim for breach of the non-competition covenant, the Court also denies the motion for preliminary injunction on that issue. In considering the remaining issues, the Court concludes that InVue is entitled to a narrow preliminary injunction as to the solicitation of its customers but not as to the Confidentiality Agreement.

## A. Legal Standard

39. A preliminary injunction is "an extraordinary measure taken by a court to preserve the status quo of the parties during litigation." *Ridge Cmty. Inv'rs, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977). The plaintiff bears the burden to establish the "right to a preliminary injunction," *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975), and is entitled to relief only: "(1) if [the] plaintiff is able to show [a] *likelihood* of success on the merits of his case and (2) if [the] plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [the] plaintiff's rights during the course of litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (internal quotation marks omitted).

40. "Injunctive relief is granted only when irreparable injury is real and immediate." *Hall v. City of Morganton*, 268 N.C. 599, 600–01, 151 S.E.2d 201, 202 (1966). The plaintiff may demonstrate irreparable injury by showing that "the injury is beyond the possibility of repair or possible compensation in damages" or "that the injury is one to which the complainant should not be required to submit or the other party permitted to inflict, and is of such continuous and frequent recurrence that no reasonable redress can be had in a court of law." *A.E.P.*, 308 N.C. at 407, 302 S.E.2d at 763 (emphasis omitted). A court should not enter an injunction if there is a "full, complete and adequate remedy at law." *Bd. of Light & Water Comm'rs v. Parkwood Sanitary Dist.*, 49 N.C. App. 421, 423, 271 S.E.2d 402, 404 (1980); *see also A.E.P.*, 308 N.C. at 406, 302 S.E.2d at 762. In addition, the trial court must weigh the potential

harm a plaintiff will suffer if no injunction is entered against the potential harm to a defendant if the injunction is entered. *See Williams v. Greene*, 36 N.C. App. 80, 86, 243 S.E.2d 156, 160 (1978).

### B. Analysis

#### 1. Non-Solicitation

41. The non-solicitation covenant prohibits Stein from contacting or soliciting three overlapping groups of customers: (1) those with whom he did business in the twelve months prior to his resignation from InVue; (2) customers of InVue during that same period; or (3) customers made known to Stein through his employment with InVue. (*See* V. Compl. Ex. C at 2–3.) In addition, the covenant is limited to contacts made by Stein "for the purpose of inducing the client or customer to terminate or modify its relationship with" InVue. (V. Compl. Ex. C at 3.)

42. InVue argues that Stein breached this covenant by contacting Verizon Wireless and four other InVue customers. (InVue Reply 7–8, ECF No. 46.) Stein counters that the covenant is facially invalid and that he has not sought to induce any customer to modify its relationship with InVue. (*See* Stein's Resp. Br. 11–13, ECF No. 41.)

43. In his first argument, Stein reiterates his view that the covenant is unenforceable because it prohibits solicitation of customers with which he had no direct contact. Again, the Court disagrees. InVue has provided evidence, in the form of verified allegations and supporting affidavits, that Stein's position involved substantial responsibility and gave him access to "customer lists," "business plans,"

and related materials. (V. Compl. ¶ 40.) Stein also acknowledges that he had awareness of—and, on occasion, temporary responsibility for—customer accounts handled by other InVue employees. (2d Aff. of Stein ¶ 15.) This evidence supports a prohibition on solicitation of customers beyond those with which he had direct contact. *See Triangle Leasing*, 327 N.C. at 229, 393 S.E.2d at 858 (affirming preliminary injunction and holding that access to customer lists supported scope of contractual non-solicitation clause).

44. Stein also relies on *Evo Corp. v. Poling*, in which this Court denied a motion for preliminary injunction based on a non-solicitation clause. 2015 NCBC LEXIS 83 (N.C. Super. Ct. Aug. 20, 2015). The case is inapposite. In *Evo*, the covenant prohibited the former employee from soliciting any *potential* customer and also prohibited activities in a fifty-mile radius around each customer. These broad (and unusual) restrictions were both central to the Court's decision. *See Evo*, 2015 NCBC LEXIS 83, at *14. Stein's non-solicitation clause does not include any equivalent prohibitions. (*See* V. Compl. Ex. C at 2–3.) Accordingly, the Court concludes, at this stage, that InVue is likely to succeed in demonstrating that the non-solicitation covenant is enforceable.

45. The more difficult question is whether Stein's activities were "for the purpose of inducing [any customer] *to terminate or modify* its relationship with" InVue. (V. Compl. Ex. C at 3 (emphasis added).) InVue appears to construe this language to prohibit Stein from soliciting any and all business from its customers. The Court does not read it so broadly. By its plain terms, the covenant centers on

InVue's relationship with its customers, not on Stein's solicitation of business more generally. Furthermore, before agreeing to the covenant, Stein deleted language that would have prevented him from "otherwise engag[ing]" in business with InVue's customers. (V. Compl. Ex. C at 5.) InVue's interpretation would read that language back into the covenant, upsetting the parties' bargain. Accordingly, the question is not simply whether Stein contacted InVue's customers or even whether he attempted to market a competing product to them. It is instead whether, by doing so, Stein sought to induce a modification or termination of an existing relationship with InVue.

46. With this understanding, it is clear that InVue has not demonstrated a likelihood of success as to four of the five customers Stein allegedly solicited. InVue's allegations that Stein contacted Prime Communications, Spring Communications, and Staples are conclusory, with no explanation of the nature of Stein's solicitation or its consequences. (V. Compl. ¶¶ 36, 50.) InVue does not even address these customers in its opening or reply briefs. The allegations regarding Wireless Lifestyle are equally deficient: although InVue asserts that it lost Wireless Lifestyle's business to Scorpion, InVue presents no evidence tying *Stein* to Wireless Lifestyle, and it acknowledges that Wireless Lifestyle was a "prospective customer," not a customer with an existing relationship. (InVue Br. in Resp. to Obj. & Mot. to Strike 6, ECF No. 39.) Simply put, there is no evidence that Stein took any action designed to induce these businesses to terminate or modify their relationships with InVue.

47. As to Verizon Wireless, the case for a breach is far more compelling. InVue began selling Verizon Wireless "hardware and software based security solutions"

several years ago. (Aff. of Grant ¶ 4.) Recently, InVue began developing—at Verizon Wireless's request—a new software-based security product. (Aff. of. Grant ¶ 10.) Stein was aware of this collaboration. Verizon Wireless was one of his largest customers, and he "was involved . . . in the development and sale of [the] new wireless security product." (Aff. of Grant ¶¶ 10, 14.)

48. It is undisputed that Stein visited Verizon Wireless after resigning from InVue and that, upon being seen by InVue employees at Verizon Wireless's offices, Stein asked that they conceal his presence from others at InVue. (2d Aff. of Stein ¶ 24.) Stein concedes that he sought to market Scorpion's SWIS product to Verizon Wireless. (Aff. of Stein ¶ 8, ECF No. 8.) According to InVue, he did so with full knowledge that SWIS is competitive with InVue's theft-reduction devices and highly similar to the software-based product that it has been developing in collaboration with Verizon Wireless. (InVue Br. in Supp. 7–9; ECF No. 27.)

49. Although Stein insists that SWIS "is not a theft reduction device" competitive with InVue's products, his argument is unpersuasive. (Stein's Resp. Br. 15.) As Stein admits in his second affidavit, SWIS is a software application that "functions *to lock the device* and provide location retrieval data." (2d Aff. Stein ¶ 21 (emphasis added).) In addition, devices that prevent or deter theft may be hardware based, software based, or a combination of the two. SWIS appears to fit comfortably within this group of products, and the evidence tends to show that SWIS is similar to the software-based product InVue is developing specifically for Verizon Wireless.

50. From this evidence, the Court concludes that Stein did more than simply attempting to engage in business with Verizon Wireless. Stein knew that InVue and Verizon Wireless were collaborating on a software-based solution, and his actions have significant potential to undermine, if not end, that collaboration. This evidence amply supports InVue's claim that Stein solicited Verizon Wireless for the purpose of inducing it to terminate or modify its relationship with InVue. Thus, InVue has carried its burden to establish a likelihood of success on its claim that Stein breached the non-solicitation covenant.

51. The Court also concludes that InVue has demonstrated a reasonable apprehension of irreparable harm. Verizon Wireless is one of InVue's largest customers. InVue has a legitimate interest in protecting its customer relationship from interference by Stein, who is performing duties for Scorpion that are highly similar to those he performed for InVue. The Court is persuaded that, in the event Verizon Wireless ends its collaboration with InVue as to a software-based product, the harm would be difficult to remedy through damages.

52. The remaining issue concerns the scope of an appropriate injunction. A preliminary injunction must be tailored to the irreparable harm faced by the plaintiff. In addition, the order must "be specific in terms, and describe in reasonable detail the act or acts restrained or enjoined." *Gibson v. Cline*, 28 N.C. App. 657, 659, 222 S.E.2d 478, 479 (1976). As the United States Supreme Court has held, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).

53. InVue asserts that the injunction should track the language of the non-solicitation covenant and extend, more or less, to all of its customers for the past year. The Court disagrees. In many circumstances, evidence that a defendant improperly solicited one customer would warrant an injunction against solicitation of other customers to protect the plaintiff's interests. In this circumstance, a broad injunction would be more likely to interfere with Stein's legitimate right to engage in business than to protect InVue from wrongful interference with its customer relationships.

54. The irreparable harm resulting from Stein's solicitation of Verizon Wireless appears to be unique to that customer, and there is no evidence from which the Court could conclude that solicitation of other customers would be likely to result in similar irreparable harm. As noted, the non-solicitation covenant does not generally prohibit Stein from engaging in business with InVue's customers. Moreover, InVue has provided no details regarding its relationships with other customers. InVue has not supplied a list of its customers, and, when questioned at oral argument, InVue's counsel could not identify how many customers the covenant's restriction might include. It is entirely unclear whether Stein's interactions with other customers would be acceptable competition for future business or an attempt to alter the customers' relationships with InVue. Accordingly, the record does not support extending an injunction to all of InVue's customers, and doing so would simply invite further disputes and motions practice with the underlying threat "of a contempt citation." *Schmidt*, 414 U.S. at 476.

55.     In light of these considerations, the Court enjoins Stein from directly or indirectly contacting Verizon Wireless for the purpose of inducing Verizon Wireless to terminate or modify its relationship with InVue. Stein may not market to Verizon Wireless the SWIS product or any other product in competition with products sold by InVue. This injunction does not extend to other InVue customers or restrict Stein's right to engage in business with them.

56.     The balancing of the equities supports this limited injunction. It protects InVue's longstanding collaboration and relationship with Verizon Wireless. On the other hand, Stein may continue to work for Scorpion and make a living in his chosen field.

57.     For these reasons, the Court grants InVue's motion for a preliminary injunction as to the non-solicitation covenant, subject to the identified limitations.

## 2. Non-Solicitation of Employees

58.     The Temporary Restraining Order separately enjoins Stein from "contacting or soliciting, directly or indirectly, the employees of InVue or former employees of InVue who were employed within the twelve (12) month period preceding termination of Defendant Stein's employment." (TRO at 2.) In support of its motion for preliminary injunction, however, InVue does not address the solicitation of InVue's employees or argue that this restriction should continue. The Court deems it abandoned and declines to convert this aspect of the Temporary Restraining Order into a preliminary injunction.

3. <u>Confidentiality Agreement</u>

59.   InVue also seeks "to preliminarily enjoin Stein (and Scorpion) from misappropriating and using InVue's confidential information." (InVue Br. in Supp. 2–3.) The basis for this request is unclear. Although InVue spends considerable time addressing the non-competition and non-solicitation covenants, its opening brief glosses over the Confidentiality Agreement. As best the Court can tell, InVue's position consists of a single paragraph, without citation, in the statement of facts (InVue Br. in Supp. 13) and a passing reference in the argument to the alleged irreparable harm that will flow from further violations of the Confidentiality Agreement (InVue Br. in Supp. 22).

60.   In its reply brief, InVue attempts to remedy these deficiencies. It contends that the Court should "infer" that Stein's discussions with Verizon Wireless involved InVue's confidential information. (InVue Reply 9.) It also cites cases in which the anticipated or inevitable disclosure of trade secrets warranted injunctive relief. (InVue Reply 10.)

61.   Even assuming these arguments are timely, the Court finds them unpersuasive. In the absence of evidence that Stein actually disclosed confidential information to Verizon Wireless, InVue's speculation that he may have done so is insufficient to carry its burden. Furthermore, InVue has not identified any information that is subject to trade-secret protection, and its reliance on such cases is misguided.

62.    As a result, InVue has not carried its burden to demonstrate a likelihood of success on the merits or that irreparable harm will result if an injunction is not issued.    The Court denies the motion for preliminary injunction as to the Confidentiality Agreement.

V.
CONCLUSION

63.    For these reasons, the Court **GRANTS** Stein's motion to dismiss InVue's claim for breach of contract to the extent it is based on the non-compete clause.    In all other respects, the Court **DENIES** Stein's motion to dismiss.

64.    The Court **GRANTS** InVue's motion for a preliminary injunction as to the non-solicitation covenant.

a.    Stein is preliminarily **ENJOINED** from directly or indirectly contacting Verizon Wireless for the purpose of inducing Verizon Wireless to terminate or modify its relationship with InVue.    Stein may not market to Verizon Wireless Scorpion's SWIS product or any other product in competition with products sold by InVue.

b.    This Order shall remain in force until (i) this action is resolved, (ii) the 18-month period in the restrictive covenant expires, or (iii) further order of this Court, whichever occurs first.

c.    InVue shall provide security for the payment of costs and damages should it be determined that Stein has been wrongfully enjoined or restrained by this Order.    Upon considering the facts of record, and in its discretion, the Court concludes that a $25,000 bond is appropriate (including the $1,500 previously

posted for the temporary restraining order). InVue shall post the bond in the form of a third-party surety bond undertaking or a cash security deposit with the Clerk of Superior Court of Mecklenburg County, North Carolina. This Order shall become effective upon InVue's posting of the bond or security.

d. In all other respects, InVue's motion for preliminary injunction is **DENIED**.

65. The Court has also fully considered Stein's motion to strike. The evidence to which Stein objects is not necessary to the Court's decision. Accordingly, the Court **DENIES** the motion to strike as moot.

This the 18th day of December, 2017.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases