PDF Elec. & Supply Co. v. Jacobsen, 2020 NCBC 64.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | 20 CVS 4609 |

PDF ELECTRIC & SUPPLY
COMPANY, LLC and AGS
ASSOCIATES, LLC d/b/a MRO
ELECTRIC AND SUPPLY
COMPANY INC.,

              Plaintiffs,

    v.

WILLIAM JACOBSEN;
CHRISTIAN JACOBSEN;
VISION CONTROLS LLC; and
INDUSTRIAL AUTOMATON
CO.,

              Defendants.

**ORDER ON DEFENDANTS' MOTION
TO DISMISS**

THIS MATTER comes before the Court on Defendants' Motion to Dismiss. ("Motion to Dismiss," ECF No. 16.)  Defendants filed a Memorandum in Support of the Motion to Dismiss.  ("Memorandum in Support," ECF No. 17.)  Plaintiffs filed a Brief in Opposition to the Motion to Dismiss on June 29, 2020, ("Brief in Opposition," ECF No. 40), and on July 9, 2020, Defendants filed a Reply in support of the Motion to Dismiss ("Reply," ECF No. 51).  On August 4, 2020, the Court held a hearing on the Motion to Dismiss, which is now ripe for decision.

THE COURT, having considered the Motion to Dismiss, the briefs in support of and opposition to the Motion to Dismiss, the arguments of counsel presented at the hearing on the Motion to Dismiss, the applicable law, and other appropriate matters

of record, CONCLUDES, that the Motion to Dismiss should be GRANTED, in part, and DENIED, in part, for the reasons set forth below.

> *Coats & Bennett, PLLC, by David E. Bennett, Gavin B. Parsons, David Kalish, and Brandee Woolard for Plaintiffs PDF Electric & Supply Company, LLC and AGS Associates, LLC d/b/a MRO Electric and Supply Company Inc.*
>
> *Shanahan Law Group, PLLC, by Nathaniel Pencook, Brandon S. Neuman, and Jeffrey Masaaki Kelly for Defendants William Jacobsen; Christian Jacobsen; Vision Controls LLC; and Industrial Automaton Co.*

McGuire, Judge.

## I. FACTS AND PROCEDURAL BACKGROUND

1. The Court does not make findings of fact when ruling on a motion to dismiss pursuant to Rule 12(b)(6) but only recites those factual allegations that are relevant and necessary to the Court's determination of the Motion. The facts recited herein are drawn from the Verified Complaint. ("Complaint," ECF No. 4.)

2. Plaintiffs PDF Electric & Supply Company, LLC ("PDF") and MRO Electric and Supply Company Inc. ("MRO") are "independent wholesale distributors of factory automation parts and conduct their business exclusively on the Internet." (ECF No. 4, at ¶ 11; for purposes of this order, the Court refers to PDF and MRO collectively as "MRO".) MRO sells thousands of new and refurbished factory automation parts to its customers including, but not limited to, programmable logic controllers and their components, human machine interfaces including touchscreen panels, variable frequency speed drives, power supplies, circuit breakers, servo motors, and robotic parts. (*Id*. at ¶ 13.) MRO buys the parts it sells from third-party suppliers and vendors.

3. MRO alleges that it has developed and possesses trade secrets and other confidential business information. (*Id.* at ¶ 34.) MRO's trade secrets fall into five categories: "SEM Strategies including Adwords;" its list of "Top Selling Parts;" its list of "Suppliers;" its "Price List;" and its "Competitive Business Method." (*Id.*)

*A. SEM Strategy including Adwords and Top Selling Parts*

4. As an Internet-based online sales company, MRO's business model is founded upon its ability to show up on search results. (*Id.* at ¶ 18.) MRO's sole marketing and advertising presence is on the Internet, and it does not use print advertisements, direct mail, or any in-person sales force. MRO alleges that if it does not successfully show up on Internet searches on platforms such as Google, its business will fail. (*Id.*) MRO has developed Internet strategies and techniques to optimize the ranking of their websites on the search results ("SEM Strategies"). (*Id.* at ¶ 17.) MRO alleges that its SEM Strategies have been developed over a number of years and are protectable trade secrets. (*Id.*)

5. MRO further describes its confidential SEM Strategies and Top Selling Parts as follows:

> 19. Potential customers interested in purchasing a part in MRO's market typically enter the original equipment manufacturer's part number into an Internet search engine such as Google. The search engine returns a list of search results that comprises links for various websites that offer the parts for sale. Because of the SEM Strategies, MRO's websites would appear high on the list of search results which is advantageous for selling the part over a competitor's website that appears lower on the search results.

20. The SEM Strategies include pay per click advertising ("PPC") featuring Adwords particularly through Google Adwords in which MRO bids to gain top position on certain keywords that are likely to be entered by potential customers. MRO spent thousands of hours developing and improving their Adwords and SEM Strategies during which it ran multiple ad versions for its 9,000 plus parts. MRO continually edited ads to see which worked best and modified its bidding algorithm for the ads. MRO used the Top Selling Parts as a key feature in developing and optimizing its search results positioning through Adwords.

21. The Adwords were effective as some years up to 40% of all MRO sales were obtained through the Adwords campaign.

22. MRO used the Top Selling List to focus its marketing efforts as it is less impactful to equally promote the 9,000 plus parts that it sells. Instead, MRO has found that it is far more successful and profitable to spend more of its advertising budget on Adwords derived from the Top Selling List.

(*Id.* at ¶¶ 19–21.)

### B. Suppliers

6. MRO buys parts for resale from third-party suppliers located throughout the world. Through years of experience, MRO has developed a list of trusted suppliers who provide high quality, reliable, and guaranteed parts. (*Id.* at ¶ 26.) This curated list of suppliers "gives MRO the ability to more efficiently buy and price [p]arts, reduces the number of warranty claims that MRO has to pay for, and avoids expense and client frustration by providing technical support." (*Id.* at ¶ 27.)

### C. Price List

7. MRO has developed a Price List for the parts that it sells "based on MRO's industry experience, knowledge of the market, and sales history." (*Id.* at ¶¶

29–30.)  The Price List is not publicly available, and a price is only provided after MRO receives an inquiry about the part.  (*Id*. at ¶ 31.)  MRO's Price List remains "relatively constant over time."  (*Id*. at ¶ 32.)

*D.  Competitive Business Method*

8.      MRO alleges that its overall method of doing business and competing in the automation parts market, including its SEM Strategies along with AdWords, Top Selling Parts, Suppliers, and Price List, constitutes a trade secret.  (*Id*. at ¶ 33.)

*E.  Jacobsen's Employment with MRO*

9.      MRO hired Defendant William Jacobsen ("Jacobsen") in June 2016.  As a condition of employment, MRO required Jacobsen to sign a Non-Disclosure/Non-Compete Agreement ("NDA").  (*Id*. at ¶¶ 38–39, Ex. 1.)  Jacobsen signed the NDA on June 28, 2016.  (*Id*.)  The NDA provides, in relevant part, as follows:

> 2.  Confidential Information controlled by this Agreement refers to information which is confidential and/or proprietary and includes by way of example, but without limitation, data, knowhow, formulae, processes, designs, sketches, photographs, plans, drawings, specifications, samples, reports, customer lists, pricing information, studies, findings, inventions and ideas. To the extent practical, Confidential Information shall be disclosed in documentary or tangible form marked "Confidential" or "Proprietary".  In addition this agreement shall cover disclosures in nondocumentary form made orally or by visual inspection. The discloser shall have the right, or, if requested by the recipient, the obligation to confirm in writing the fact and general nature of each disclosure within a reasonable time after it is made in order that it be treated as Confidential Information but is not required to have it in writing for it to be treated as Confidential Information.

3. The Confidential Information controlled by this Agreement more specifically relates to information that the parties may have relating to the general business, specific industry, and the products, processes, services, approaches, tools and/or solutions that the parties may have for that business. . . .

5. . . . .

Confidential Information of the disclosing party cannot be used by the receiving party for any other purpose or be made available by the receiving party to any third party without the written permission of the disclosing party. This includes but is not limited to competing with [PDF and MRO] directly or indirectly in internet based product resale or distribution or supplying confidential information to anyone or any business that would compete directly or indirectly with [PDF and MRO]. . . .

7. Once executed on the effective date information between the parties will be considered Confidential Information that has been disclosed in the past sixty days through the termination of the Confidentiality Agreement or a new Confidentiality Agreement will be put in place.

8. A recipient of a disclosure of Confidential Information shall not be under any obligation under this Agreement five (5) years after this Effective Date, at which time this Agreement shall terminate.

(ECF No. 4, Ex. 1.)

10. Jacobsen's "primary job responsibilities were to work on the SEM Strategies including the Adwords campaign," monitor MRO's various online rankings, maintain the top position for Adwords associated with key words for the Top Selling Parts," and "[perform] fill-in sales functions when other employees were unavailable." (*Id*. at ¶38.) In performing his job duties, Jacobsen had access to and used MRO's trade secrets and confidential business information. (*Id*. at ¶¶ 43–46.)

11.     Jacobsen resigned from MRO in October 2017.  MRO rehired Jacobsen on February 5, 2018, to perform the same job duties.  (*Id.* at ¶ 48.)

12.     MRO alleges that beginning in February 2018, unbeknownst to MRO, Jacobsen created a website and an eBay account to compete with MRO using MRO's trade secrets and proprietary and confidential information.  (*Id.* at ¶¶ 49–53.)  By late 2018, Jacobsen was selling automation parts that were on MRO's Top Selling Parts List.  (*Id.* at ¶ 52.)

13.     On February 15, 2019, Jacobsen resigned from MRO.  (*Id.* at ¶ 54.)  Jacobsen has continued to sell parts through his eBay account since his resignation.  (*Id.* at ¶ 55, 60.)

14.     On September 9, 2019, Jacobsen and his brother, Defendant Christian Jacobsen ("Christian"), filed Articles of Organization for Vision Controls LLC ("Vision Controls") with the North Carolina Secretary of State.  (*Id.* at ¶ 56.)  Jacobsen also operates a competitive business under the name Industrial Automation Company (hereinafter "Industrial Automation") which appears to operate the website vision-controls.com.  (*Id.* at ¶ 57.)

15.     MRO alleges that Defendants sell parts, in competition with MRO, through at least the following websites: industrialautomationco.com, indisutrialautomation.com, and indautoco.com.  (*Id.* at ¶ 61.)  MRO further alleges that Defendants are using the Price List to undercut MRO's prices and using MRO's SEM Strategies and Adwords to displace MRO in online searches, disrupting MRO's otherwise successful SEM Strategies.  (*Id.* at ¶¶ 63–64.)  MRO's sales have declined,

and it alleges "nearly $1,000,000" of this loss is attributable to Defendants' actions. (*Id*. at ¶ 67.)

16. Finally, MRO alleges that Jacobsen took steps to prevent MRO from learning that he was operating his competing websites and, as a result, MRO didn't become aware that Jacobsen was operating Industrial Automation or Vision Controls until approximately March 10, 2020. (*Id*. at ¶¶ 68–72.)

17. On March 26, 2020, Plaintiffs filed the Complaint seeking injunctive relief and damages arising out of Defendants' alleged misuse of MRO's trade secrets and confidential information and Jacobsen's violation of the NDA. (ECF No. 4.) In the Complaint, Plaintiffs allege claims against all Defendants for: misappropriation of MRO's trade secrets in violation of N.C.G.S. § 66-153 (Count I); unfair and deceptive trade practices in violation of N.C.G.S. § 75-1.1 (Count II); civil conspiracy (Count III); temporary restraining order and preliminary and permanent injunctions (Count IV); unjust enrichment (Count VII); and common law unfair competition (Count IX). *Id*. Plaintiffs allege claims against Jacobsen only for breach of contract (Count V); breach of confidence (Count VI); and failure to register assumed name (Count VIII). *Id*.

18. On June 1, 2020, Defendants filed the Motion to Dismiss. Defendants seek dismissal of all of Plaintiffs' claims except for Count IV and Count VIII. (ECF No. 16, at p. 2.)

## II.    ANALYSIS

### A.  *Standard of Review*

19.    In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  Our appellate courts frequently reaffirm that North Carolina is a notice pleading state.  *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.*, 235 N.C. App. 633, 647, 762 S.E.2d 477, 486 (2014)) ("Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought.").

20.    "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

21.    In ruling on a Rule 12(b)(6) motion, the court construes the complaint liberally and accepts all allegations as true.  *See Laster v. Francis*, 199 N.C. App. 572,

577, 681 S.E.2d 858, 862 (2009).  However, the Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation and quotation marks omitted).

22.  In addition, "when ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant."  *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

### B.  Claims for Breach of the NDA

23.  Defendants first challenge Plaintiffs' claims against Jacobsen for breach of the non-compete provisions of the NDA (Count V) and breach of the confidentiality provisions of the NDA (Counts V and VI).[1]  (ECF No. 17, at pp. 10–17.)  In Count V, Plaintiffs allege that Jacobsen breached the NDA by "a. Competing with Plaintiffs during his employment; b. Competing with Plaintiffs following the end of his employment; and c. Making use of Plaintiffs' confidential information and trade secrets to compete with Plaintiffs."  (*Id*. at ¶ 140.)  In Count VI, Plaintiffs allege

---

[1] Plaintiffs label the claim alleged in Count VI of the Complaint as "Breach of Confidence." (ECF No. 4, at p. 20.)  However, Plaintiffs do not allege, nor argue in the Brief in Opposition, that Jacobsen was under any duty to maintain its confidential information other than any duty imposed by the NDA.  Accordingly, the Court treats both Counts V and VI as raising claims for breach of the non-disclosure covenant in the NDA.

Jacobsen violated the NDA by disclosing and using MRO's trade secrets and confidential information. (*Id.* at ¶ 148.)

24. Defendants contend that the breach of the NDA claims should be dismissed because the NDA, on its face, establishes that its restrictions expired on October 17, 2016. (ECF No. 17, at pp. 11–14.) Defendants argue that the NDA provides that "[a] recipient of a disclosure of Confidential Information shall not be under any obligation under this Agreement five (5) years after this Effective Date, at which time this Agreement shall terminate," and that the NDA states its "Effective Date" is October 17, 2011. (*Id.* at p.12; ECF No. 4, Ex. 1, p. 2.) Defendants argue that the term Effective Date is a capitalized, defined term in the NDA, and must be given its defined meaning. (*Id.* at pp. 12–14; citing *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) (where a contract "contains a definition of a term used in it, this is the meaning which must be given to that term wherever it appears in the [contract], unless the context clearly requires otherwise") and *Legacy Vulcan Corp. v. Garren*, 222 N.C. App. 445, 450, 731 S.E.2d 223, 228 (2012) (recognizing that the consistent capitalization of a term indicated an intent to have the same meaning throughout a document).

25. In response, Plaintiffs argue that the NDA must be interpreted so as to fulfill the intent of the parties at the time they made the agreement, "and to do this consideration must be given to the purpose to be accomplished, the subject-matter of the contract, and the situation of the parties." (ECF No. 40, at p. 5; citing and quoting *Weyerhauser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719-720, 127 S.E. 2d

539, 541 (1962)). Plaintiffs contend that the parties simply could not have intended an effective date of October 17, 2011, since it would result in the NDA terminating less than four months after they executed the agreement. Instead, the purposes of the contract and situation of the parties at the time of its execution lead to the conclusion that the parties intended the NDA to have an effective date of June 28, 2016 and to obligate Jacobsen for five years after that date. (ECF No. 40, at pp. 5–9.) Plaintiffs argue that paragraph seven of the NDA supports this conclusion, providing in relevant part, that "[o]nce executed on the effective date information between the parties will be considered Confidential Information that has been disclosed in the past sixty days through the termination of the Confidentiality Agreement." (ECF No. 4, at Ex. 1, p. 2.) Plaintiffs contend that this language shows that the parties understood the effective date of the NDA to be the date of execution – June 28, 2016 – and that any other interpretation would be absurd. (ECF No. 40, at pp. 7–9.) Finally, Plaintiffs argue that the parties did not intend the capitalization of terms in the NDA to have any significance.[2] (ECF No. 40, at p. 8.)

26. It is well-settled that "[w]here the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Happ v. Creep Pointe Homeowner's Assoc.*,

---

[2] Plaintiffs also contend that the reference to an "Effective Date _ October 17, 2011" at the top of the first page of the NDA merely reflects the date on which Plaintiffs' started using that version of the NDA, which subsequently was signed by a number of employees, including Jacobsen on June 28, 2016. (ECF No. 40, at p. 6.) The Court finds this explanation to be unlikely. Instead, it is more likely that the use of an agreement dated October 17, 2011 in June 2016 was the result of inadvertence or error.

215 N.C. App. 96, 103, 717 S.E.2d 401, 406 (2011) (alterations in original) (quoting *Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009)). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs.*, 362 N.C. 269, 273, 658 S.E.2d 918, 922 (2008) (citation omitted).

27.    "Extrinsic evidence may be consulted when the plain language of the contract is ambiguous." *Brown v. Ginn*, 181 N.C. App. 563, 567, 640 S.E.2d 787, 790 (2007) (citations omitted); *Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354, 712 S.E.2d 366, 369 (2011).  However, if the court determines that "the terms of the contract are ambiguous" and "extrinsic evidence is necessary," then the question of construction of the contract is one for the jury.  *Whirlpool Corp. v. Dailey Constr., Inc.*, 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993) (citing *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 306 S.E.2d 587 (1983)); *see also Martin v. Ray Lackey Enterprises, Inc.*, 100 N.C. App. 349, 354, 396 S.E.2d 327, 330 (1990) ("[I]ntent is a question of law where the writing is free of any ambiguity which would require resort to extrinsic evidence or the consideration of disputed fact."); *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 157, 306 S.E.2d 587, 590 (1983) ("Ambiguities in contracts are to be resolved by the jury upon consideration of 'the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time.'") (*quoting Silver v. Bd. of Trans.*, 47 N.C. App. 261, 268, 267 S.E.2d 49, 55 (1980)).

28. The Court has thoroughly reviewed the language used in the NDA and the arguments of counsel and concludes that the term "Effective Date" as used in the agreement is ambiguous. While capitalization of a term in a contract might indicate that it has a defined meaning, in the NDA "Effective Date" is used in both capitalized and uncapitalized forms with seemingly conflicting meanings. The meaning of the term must be decided by a jury if such interpretation becomes necessary in this case.

i. Enforceability of the NDA as a covenant not to compete

29. Defendants next argue that the NDA is unenforceable as a non-compete agreement because the so-called non-competition covenant is overbroad and it "restrict[s] Jacobsen's ability to compete in an open market using readily-ascertainable information." (ECF No. 17, at p. 14–17.) Defendants contend that the covenant is overbroad because it has no fixed geographic limitation and because it extends for a period of five years. (*Id.* at p. 16.) Defendants further contend that the non-disclosure covenants in the NDA prohibiting Jacobsen from selling anything on MOR's Top Selling Parts list or using MRO's suppliers are an unlawful restraint on trade that effectively prevent Jacobsen from working in any capacity. (*Id.* at p. 14.)

30. The elements necessary to establish an enforceable non-compete agreement between an employer and employee under North Carolina law are well established. *Okuma Am. Corp. v. Bowers*, 181 N.C. App. 85, 88, 638 S.E.2d 617, 620 (2007). "The reasonableness of a non-competition covenant is a matter of law for the court to decide." *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). Courts scrutinize non-compete agreements because they

"are not viewed favorably in modern law." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (quoting *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279, 530 S.E.2d 878, 881 (2000)) (internal quotation marks omitted). Accordingly,

> To be valid, the restrictions on the employee's future employability by others must be no wider in scope than is necessary to protect the business of the employer. If a non-compete covenant is too broad to be a reasonable protection to the employer's business it will not be enforced. The courts will not rewrite a contract if it is too broad but will simply not enforce it.

*Id.* at 508, 606 S.E.2d at 362 (internal citations and quotations omitted).

31. Non-compete agreements that bar an "employee from working in an identical position for a direct competitor" are enforceable in North Carolina. *Okuma Am. Corp.,* 181 N.C. App. at 90–91, 638 S.E.2d at 621 (citing *Precision Walls v. Servie*, 152 N.C. App. 630, 638–39, 568 S.E.2d 267, 273 (2002)); *see also Ridgway,* 194 N.C. App. at 656, 670 S.E.2d at 327. On the other hand, our appellate courts consistently hold non-compete agreements purporting to prohibit a former employee "from having any association with a business providing similar services, including performing even wholly unrelated work" to be overbroad and unenforceable. *Andy-Oxy Co., Inc. v. Harris*, No. COA19-10, 2019 N.C. App. LEXIS 902, at *9–10, 834 S.E.2d 195 (N.C. Ct. App. Nov. 5, 2019) (citing *Hartman v. W.H. Odell & Assocs.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994)); *VisionAIR*, 167 N.C. App. at 509, 606 S.E.2d at 362; *see also Henley Paper Co. v. McAllister,* 253 N.C. 529, 534–35, 117 S.E.2d 431, 434 (1960). Particularly problematic are covenants that restrict an employee from "directly or

indirectly" having any association with a competing business. *Andy-Oxy Co., Inc.,* No. COA19-10, 2019 N.C. App. LEXIS 902, at *11–12; *VisionAIR*, 167 N.C. App. at 508–09, 606 S.E.2d at 362–63.

32. The non-compete covenant at issue here states as follows:

> Confidential Information of the disclosing party cannot be used by the receiving party for any other purpose or be made available by the receiving party to any third party without the written permission of the disclosing party. This includes but is not limited to competing with [PDF and MRO] directly or indirectly in internet based product resale or distribution or supplying confidential information to anyone or any business that would compete directly or indirectly with [PDF and MRO].

(ECF No. 4, Ex. 1 at ¶ 5.) Effectively, the covenant purports to prohibit Jacobsen from "competing . . . directly or indirectly" with MRO by using or disclosing its confidential information to a company that "compete[s] directly or indirectly" with PDF or MRO. (*Id.*)

33. "North Carolina courts will treat a non-disclosure agreement as a contract in restraint of trade in appropriate circumstances." *Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *23 (N.C. Super. Ct. Oct. 15, 2015) (citing *ChemiMetals*, 124 N.C. App. at 197, 476 S.E.2d at 376–77). A non-disclosure provision equates to a restrictive covenant in restraint of trade and is subject to the same analysis as a covenant not to compete if "the anticipated and intended effect of the prohibition on [an employee's] disclosure . . . is not to protect [the company's] confidential business information" but rather to prevent a former employee from

competing with the former employer. *See Amerigas Propane, L.P.,* 2015 NCBC LEXIS 98, at \*24–25 (compiling cases).

34. Applying these principles, the Court finds that the NDA is simply not enforceable as a non-compete covenant. As an initial matter, the NDA does not define the terms "compete" or "competing," and restricts Jacobsen from competing "directly or indirectly" with PDF and MRO. These vague, broad terms could prohibit Jacobsen from working for a competitor in job completely unrelated to Jacobsen's duties with MRO and Jacobsen owning stock in a competing company through a mutual fund. *See VisionAIR, Inc.,* 167 N.C. App. at 508-509, 606 S.E.2d at 362-363. Therefore, it is not clear from what activities Jacobsen is restricted by the NDA, and the Court can cannot determine the intended scope of the prohibition.

35. The Court concludes that the NDA is unenforceable as a non-compete covenant under North Carolina law. Therefore, to the extent Defendants seeks dismissal of the claim for breach of a covenant not to compete in Count V of the Complaint for breach of contract, the Motion to Dismiss should be GRANTED.

   ii.    Enforceability of NDA as a non-disclosure agreement

36. In Counts V and VI of the Complaint, Plaintiff alleges that Jacobsen breached the non-disclosure requirements of the NDA. (ECF No. 4, at ¶¶ 142–149.) A non-disclosure provision in an employment agreement is enforceable "if it does not seek to prevent a party from engaging in a similar business in competition with the [employer], but instead seeks to prevent the disclosure or use of confidential information." *Chemimetals Processing v. McEneny*, 124 N.C. App. 194, 197, 476

S.E.2d 374, 376 (1996). To be enforceable, such a non-disclosure agreement requires only "a showing that it protects a legitimate business interest of the [employer]"; time and durational limitations are irrelevant. *Id.* at 197, 476 S.E.2d. at 377; *Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 NCBC LEXIS 90, at *14-19 (N.C. Super. Ct. July 28, 2020).

37. "In an action for breach of contract, the complaint must allege (1) the existence of a contract between the parties, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the damages resulting to the plaintiff from the breach." *Thompson v. Bass*, 261 N.C. App. 285, 290, 819 S.E.2d 621, 625–26 (2018) (citing *Cantrell v. Woodhill Enterprises, Inc.*, 273 N.C. 490, 497, 160 S.E.2d 476, 481 (1968)).

38. Although poorly drafted and not enforceable as a *non-compete* agreement, the Court concludes that Plaintiffs sufficiently pleaded a claim for violation of the NDA's non-disclosure covenants to put Defendants on notice of the nature of Plaintiffs' claim and to survive dismissal. Plaintiffs allege that the NDA is a valid contract prohibiting disclosure of MRO's confidential information, that Jacobsen breached the non-disclosure covenant by disclosing its confidential information to the Defendant businesses and Christian, and that the disclosures have resulted in damages to Plaintiffs. Plaintiffs also specifically identify the alleged confidential information they claim has been disclosed. While it may later be determined that the information at issue is not actually confidential, the claim is adequately stated at this stage of the case.

39.     Therefore, to the extent Defendants seek dismissal of claims for breach of the non-disclosure provisions of the NDA in Counts V and VI of the Complaint, the Motion to Dismiss should be DENIED.

### C. Misappropriation of Trade Secrets

40.     As their first claim, Plaintiffs allege that Jacobsen misappropriated MRO's trade secrets in violation of North Carolina Trade Secrets Protection Act, N.C.G.S. § 66-152, et seq. ("TSPA"). (ECF No. 4, at ¶¶ 73–95.) The standard for alleging a cognizable claim for misappropriation of trade secrets is well established. *County of Wayne Constr. Managers of Goldsboro v. Amory*, 2019 NCBC LEXIS 32, *18-22 (N.C. Super. Ct. May 17, 2019). To state a claim for misappropriation of a trade secret under the TSPA, "a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly*, 370 N.C. 602, 609, 811 S.E.2d 542, 547-48 (2018) (citation and quotations omitted). Additionally, the plaintiff must "set forth with sufficient specificity the acts by which the alleged misappropriation occurred." *Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *9 (N.C. Super. Ct. Oct. 21, 2016). While a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy," N.C.G.S. § 66-152(3)(b), "only where efforts to maintain the secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the 12(b)(6)

stage." *AYM Techs., LLC. v. Rodgers*, 2018 NCBC LEXIS 14, at \*40 (N.C. Super. Ct. Feb. 9, 2018) (quoting *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at \*14).

41.  Predictably, for cases in this court raising claims under the TSPA, Defendants challenge virtually every aspect of Plaintiffs' allegations making arguments better suited for summary judgment. Defendants contend that Plaintiffs have not sufficiently identified the trade secrets at issue (ECF No. 17, at pp. 17–21); have not sufficiently alleged how Jacobsen misappropriated the trade secrets (*Id.* at pp. 24–26); and have not sufficiently alleged that they took reasonable steps to protect their trade secrets. (*Id.* at pp. 22–24.)

42.  The Court has reviewed the allegations and concludes that, while less than robust on some elements, they are sufficient at this stage of the case to survive the Motion to Dismiss. First, Plaintiff has identified at least certain information that could constitute trade secrets with enough specificity to provide Defendants with notice "so as to enable a defendant to delineate that which he is accused of misappropriating." *Krawiec*, 370 N.C. at 609, 811 S.E.2d at 547-48. For example, Plaintiffs allege that they have developed "through years of experience" a curated list of suppliers that "offer truly reliable parts, and timely and effective technical support." (ECF No. 4, at ¶ 26.) The list of suppliers "gives MRO the ability to more efficiently buy and price Parts, reduces the number of warranty claims that MRO has to pay for, and avoids expense and client frustration by providing technical support." (*Id.* at ¶27.) This type of "compilation of information" could be of substantial value to a competitor just entering the automation parts business.

43.     Plaintiffs also allege that "MRO spent thousands of hours developing and improving their Adwords and SEM Strategies during which it ran multiple ad versions for its 9,000 plus parts. MRO continually edited ads to see which worked best and modified its bidding algorithm for the ads." (*Id.* at ¶ 20.) While Defendants appear to argue that there is no such thing as unique or protectable "SEM Strategies," and that all on-line retailers use the same approach to search engine optimization, (ECF No. 17, at pp. 21–22), that cannot be decided based solely on the allegations in the Complaint. Plaintiffs clearly identify at least a potential trade secret.

44.     Similarly, while Defendants argue that Plaintiffs fail to allege that they took adequate steps to maintain the confidentiality of MRO's trade secrets, Plaintiffs allege that "[e]very employee is required to sign a non-disclosure agreement on their first day of employment to prevent the disclosure or unauthorized use of the Confidential Information," and that MRO's trade secrets are "saved in password protected computer files" accessible only to "a limited number of MRO's personnel." (ECF No. 4, at ¶¶ 35–37.) At this stage, these allegations are enough to satisfy the pleadings standards for claims for violation of the TSPA.

45.     Therefore, to the extent Defendants seek dismissal of Count I of the Complaint for misappropriation of trade secrets in violation of the TSPA, the Motion to Dismiss should be DENIED.

*D. Unfair and Deceptive Trade Practices and Common Law Unfair Competition*

46.     As the second claim in the Complaint (Count II), Plaintiffs allege that the Defendants' conduct constitutes unfair and deceptive trade practices in violation

of N.C.G.S. § 75-1.1. (ECF No. 4, at ¶¶ 96–116.) Plaintiffs allege that Jacobsen learned the entire internet wholesale factory automation business through his employment with MRO, violated the NDA, used MRO's trade secrets to establish competing internet businesses both during and after his employment, took measures to conceal his conduct and his businesses from MRO, thereby resulting in serious damage to Plaintiffs' business. (*Id.*) In Count IX, "Common Law Unfair Competition," Plaintiffs allege that "Defendants' conduct was unethical and designed to misappropriate MRO's competitive advantage obtained through its investment of years of time, money and labor." (*Id.* at ¶¶ 165–169.)

47. To state a claim for a violation of N.C. Gen. Stat. § 75-1.1, Plaintiffs must allege that "(1) [the] defendant committed an unfair or deceptive act 27 or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013). A claim for common law unfair competition seeks to protect "a business from misappropriation of its commercial advantage earned through organization, skill, labor, and money." *Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749, 488 S.E.2d 234, 240 (1997). Courts have recognized that a claim for common law unfair competition is analyzed the same way as a claim for unfair or deceptive trade practices under G.S. § 75-1.1. *See BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp. 2d 598, 615 (M.D.N.C. 1999) ("The standard which a plaintiff must meet to recover on an unfair competition claim under the common law is not appreciably different [from a claim for unfair or deceptive trade

practices]."); *Blue Rhino Global Sourcing, Inc. v. Well Traveled Imports, Inc.*, 888 F. Supp. 2d 718, 721 n.1 (M.D.N.C. 2012); *Global Textile All., Inc., LLC v. TDI Worldwide LLC*, 2018 NCBC LEXIS 57, at *21 (N.C. Super. Ct. June 5, 2018).

48. The allegations in the Complaint support a claim for unfair and deceptive trade practices and for common law unfair competition. Plaintiffs allege that Jacobsen engaged in conduct that is deceptive and potentially unfair as well. Plaintiffs also allege that the Defendant companies, and Christian, have used MRO's trade secrets to create and operate websites that directly compete with MRO's site. Indeed, the Court has refused to dismiss Plaintiffs' claim for misappropriation of trade secrets. A claim for misappropriation of trade secrets can support a cause of action for violation of Section 75.1-1. *Ge Betz, Inc. v. Conrad*, 752 S.E.2d 634, 650-651, 231 N.C. App. 214, 236 (2013).

49. Therefore, to the extent Defendants seeks dismissal of Count II of the Complaint for unfair and deceptive trade practices in violation of the UDPTA and Count IX for common law unfair competition, the Motion to Dismiss should be DENIED.

*E. Unjust Enrichment*

50. Plaintiffs allege that Defendants have been unjustly enriched by misappropriating and using MRO's trade secrets to establish their competing businesses. (Count VII, ECF No. 4, at ¶¶ 150–158.) Plaintiffs contend that "MRO shared its confidential information and trade secrets with William Jacobsen for him to perform his job with MRO with the understanding he would not use it to compete

against Plaintiffs or for his own purposes, the information was not conveyed gratuitously, and by taking and making use of the information Defendants were unjustly enriched." (ECF No. 40, at p. 25.) Defendants argue that the claim for unjust enrichment should be dismissed because Plaintiffs have alleged the existence of an express contract, the NDA that governs the disclosure of confidential information, and Plaintiffs claim for breach of the confidentiality provisions of the NDA preclude a cause of action for unjust enrichment. (ECF No. 17, at p. 29.) Defendants also contend that the claim for unjust enrichment should be dismissed because Plaintiffs have not alleged that they conferred a benefit upon Defendants, but only that Defendants used Plaintiffs' confidential information for its own benefit. (*Id.*)

51. A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966) (citations omitted). In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). "The doctrine of unjust enrichment was

devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984).

52.     While a claim for unjust enrichment cannot stand where an express contract exists covering the same subject, *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 713, 124 S.E.2d 905, 908 (1962), a party is permitted to plead a claim for unjust enrichment in the alternative to a claim for breach of contract. *Bandy v. Gibson*, 2017 NCBC LEXIS 66, at *12 (N.C. Super. Ct. July 16, 2017).  The Court concludes that Plaintiffs' unjust enrichment claim should be treated as pleaded in the alternative to its claim for breach of the NDA and should not be dismissed at this stage of the litigation.

53.     Plaintiffs also allege that MRO "conferred" the benefit of providing Jacobsen with access to Plaintiffs' confidential information "for the express purpose of Jacobsen performing" his job duties, and not for Defendants' use to develop competing businesses.  (ECF No. 3, at ¶¶ 151, 154–155.)  Plaintiffs allege that "it is neither fair nor equitable for Defendants to make use of MRO's confidential information."  (*Id.* at ¶ 157.)  While these allegations are a weak recitation of a claim for unjust enrichment, the Court concludes that they are minimally sufficient to preclude dismissal at this point in the case.  *Watson Elec. Constr. Co. v. Summit Cos., LLC*, 160 N.C. App. 647, 652, 587 S.E.2d 87, 92 (2003) ("Unjust enrichment . . .

is a general principle underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself [or herself] at the expense of another.") (internal quotations omitted). Plaintiffs adequately allege that Defendants unfairly used their trade secrets and confidential information to enrich themselves.

54. Therefore, to the extent Defendants seek dismissal of Count VII of the Complaint for unjust enrichment, the Motion to Dismiss should be DENIED.

*F. Civil Conspiracy*

55. Defendants seek dismissal of Plaintiffs' allegations of civil conspiracy. (ECF No. 3, at ¶¶ 117–123 ("Count III;" ECF No. 17, at pp 29–30.) The Court has reviewed Defendants' arguments in support of dismissal and concludes that to the extent Defendants seek dismissal of Count III of the Complaint for civil conspiracy, the Motion to Dismiss should be DENIED.

## III. CONCLUSION

THEREFORE, IT IS ORDERED that:

1. To the extent Defendants seeks dismissal of the claim for breach of a covenant not to compete in Count V of the Complaint, the Motion to Dismiss is be GRANTED, and that claim is DISMISSED.

2. To the extent Defendants seek dismissal of the claims for breach of the non-disclosure provisions of the NDA in Counts V and VI of the Complaint, the Motion to Dismiss is DENIED.

3. The Motion to Dismiss as to Counts I, II, III, VII, and IX of the Complaint is DENIED.

4. Except as expressly granted herein, the Motion to Dismiss is DENIED.

SO ORDERED, this the 9th of September, 2020.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases